977 F.2d 1264
 UNITED STATES of America, Appellee,
v.
Timothy P. LONG, Appellant.
UNITED STATES of America, Appellee,
v.
Gerald H. BELL, Appellant.
UNITED STATES of America, Appellee,
v.
Stephen James GOETHKE, Appellant.
UNITED STATES of America, Appellant,
v.
Timothy P. LONG, Appellee.
 Nos. 91-3434, 91-3436, 91-3440 and 91-3555.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 13, 1992.
Decided Oct. 20, 1992.
Rehearing and Rehearing En Banc
Denied in Nos. 91-3436
and 91-3440 Dec. 10, 1992.
 
 Peter J. Thompson, Minneapolis, Minn., argued, for appellant Long.
 Deborah Kay Ellis, St. Paul, Minn., argued, for appellant Bell.
 Bruce H. Hanley, Minneapolis, Minn., argued (Bruce H. Hanley and Lisa Dejoras, on the brief), for appellant Goethke.
 Nathan P. Petterson, Minneapolis, Minn., argued (Thomas B. Heffelfinger and Nathan P. Petterson, on the brief) for appellee.
 Before FAGG, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 Timothy P. Long, Stephen James Goethke, and Gerald Henry Bell appeal their convictions for laundering money derived from the illegal distribution of drugs and aiding and abetting the laundering of such money, all in violation of 18 U.S.C. §§ 2, 1956(a)(1)(B)(i) (1988), and for conspiring to launder such money in violation of 18 U.S.C. § 371 (1988). Bell also appeals his sentence. The government cross-appeals the decision of the District Court[1] to depart downward from the guidelines in sentencing Long. We affirm.I.
 
 
 2
 Long Cadillac, Long's Imports, and Long's Other Place are three automobile dealerships in or near St. Paul. All are owned by Richard Long. Timothy Long, who is Richard Long's son, was a car salesman at Long Cadillac. Gerald Bell was the owner of West Auto Brokers, a used car dealership in St. Paul. His cousin, Terrance Graham, was the finance and insurance manager at Long Cadillac from 1973 to July 1988, and then at Long Imports until July 1989. Stephen Goethke was the finance and insurance manager at Long Cadillac from early 1989 until early 1990.
 
 
 3
 In February 1987, David Lindsey, a drug dealer from the St. Paul area, purchased a 1985 Cadillac Fleetwood from Graham at Long Cadillac for about $16,000.[2] Before Lindsey made this purchase, however, Graham advised him to keep his cash payments under $10,000 so as to avoid the IRS reporting requirements, and to finance the balance of the purchase price. When Lindsey told him that he never had been legitimately employed, Graham nevertheless assured him that financing could be arranged. Once it was approved, Lindsey, as required by this agreement, paid Graham $200 "under the table" for making the arrangements.
 
 
 4
 During the next two and a half years Lindsey purchased numerous automobiles in this manner, some from dealerships other than those owned by Richard Long. In each case, he made a cash down payment of less than $10,000 and arranged financing through Graham, paying him between $200 and $400 when Lindsey's financing for the particular purchase was approved. Graham arranged Lindsey's financing by putting false jobs on his credit applications. On Lindsey's third purchase, Graham used West Auto Brokers as Lindsey's bogus place of employment. Lindsey discovered this while signing the finance papers and thereafter continued to use West Auto Brokers to obtain financing each time he purchased a car. He still was required to contact Graham before attempting to obtain credit, and continued to pay Graham between $200 and $400 once his credit was approved.
 
 
 5
 Among the vehicles Lindsey purchased in this manner were a 1989 Cadillac Eldorado and a 1986 Mercedes-Benz. He bought the Cadillac from Timothy Long[3] at Long Cadillac for about $40,000, and the Mercedes from Graham at Long Imports for about $50,000.[4] In both cases he made cash down payments of less than $10,000, and in both cases he paid Graham for his services in preparing false credit applications and obtaining financing through West Auto Brokers. In fact, however, the false credit application for the Cadillac was completed by Long and Goethke.
 
 
 6
 Graham's assistance to Lindsey extended to helping placate the income tax authorities of the state of Minnesota, to which Lindsey never had paid state income taxes, and from which Lindsey was receiving letters. To deal with this problem, Graham had Lindsey sign an "Independent Dealer's Agreement" with West Auto Brokers. Bell signed this document on behalf of West Auto Brokers. Each month thereafter Graham would receive a West Auto Brokers paycheck made out to Lindsey and signed by Bell. He then would sell the check to Lindsey for its face amount plus $700. In this manner Lindsey could appear to have a legitimate income, and thus could pay taxes to satisfy the state. Lindsey considered this arrangement too expensive, however, and he discontinued it after receiving his third check.
 
 
 7
 John Taylor was another of the several drug dealers who had dealings with the defendants. He used drug money to purchase a 1987 Cadillac Fleetwood from Goethke for about $27,000. Goethke, the finance and insurance manager at Long Cadillac, sent Taylor to Long Imports to have Graham arrange financing.[5] Ultimately Taylor submitted a credit application listing a false job at a company called Carpets By Bob. Goethke processed that application and Taylor's credit was approved.
 
 
 8
 William Davis, another drug dealer, used drug money to purchase a 1986 Cadillac from James Long at Long's Other Place. Although Davis did have a job, his legitimate income was not high enough to acquire financing, so James Long obtained a false job for him at Carpets by Bob.[6] Next Davis and James Long went to Long Cadillac to meet with Goethke who then had Davis sign the "finance papers." Transcript at 503, 506 (Testimony of Davis).
 
 
 9
 During the government's investigation of this case, its agents conducted several interviews with Goethke. Goethke admitted that he knew Carpets by Bob was a "front" that was being used to provide a fictional cover of employment to drug dealers. Transcript at 1894-95 (Testimony of Agent Shoup). He also admitted that he processed a credit application by Taylor knowing that it was false, and that he processed other false credit applications including one for Davis.
 
 
 10
 On April 3, 1991, based upon these facts and a wealth of other information,[7] a United States grand jury charged Long, Goethke, Bell, and three other coconspirators with a total of ten counts of laundering drug money, conspiring to launder drug money, and structuring financial transactions.[8] After a month-long jury trial Long was convicted of conspiring to launder money derived from the unlawful distribution of drugs (Count I), and laundering such money through the sale of a 1989 Eldorado to David Lindsey (Count VI); Bell was convicted of conspiring to launder money derived from the unlawful distribution of drugs (Count I), aiding and abetting the laundering of such money in the sale of the 1989 Eldorado to Lindsey (Count VI), and aiding and abetting the laundering of such money in the sale of a 1986 Mercedes-Benz to Lindsey (Count VII); and Goethke was convicted of conspiring to launder money derived from the unlawful distribution of drugs (Count I), laundering such money through the sale of a 1987 Cadillac to John Lee Taylor (Count VIII), and laundering such money through the sale of a 1986 Cadillac to William Davis (Count IX).[9] The District Court sentenced Bell and Goethke to guidelines sentences of thirty-seven months in prison and three years of supervised release. In sentencing Long, the court departed downward from the guidelines sentencing range, imposing a sentence of five years on probation, twelve months in home detention, and 300 hours of community service. It also fined him $100,000.
 
 
 11
 In this appeal, Long, Bell, and Goethke challenge their convictions on a variety of grounds; Bell attacks his sentence on the ground that the District Court misapplied the guidelines; and the government objects to Long's sentence on the ground that the basis for the District Court's downward departure is not supported by the record. We affirm in all respects.
 
 II.
 A.
 
 12
 We consider first the appellants' claims that the evidence is insufficient to support their convictions. With respect to their substantive money laundering counts, all three contend that the evidence failed to show that: (1) they knew the proceeds involved in the transactions were the proceeds of some form of unlawful activity; (2) the transactions in question were designed to "conceal or disguise the nature, the location, the source, the ownership, or the control of [drug] proceeds," 18 U.S.C. § 1956(a)(1)(B)(i);[10] and (3) they knew the transactions were designed to so conceal or disguise drug proceeds.[11] Reviewing the evidence in the light most favorable to the government and giving it the benefit of all reasonable inferences, see, e.g., United States v. Schubel, 912 F.2d 952, 955 (8th Cir.1990), we find the evidence sufficient to support the substantive money laundering convictions.
 
 
 13
 At trial, Lindsey testified that Long on one occasion counselled him to keep his payments below $10,000 because otherwise "they have to turn it in to the IRS." Transcript at 678 (Testimony of Lindsey). One of Long's co-workers testified that Long told him Lindsey was taking over the drug-dealing business of an individual named Ralph Duke, who was prominently identified with illicit trade in drugs. Another co-worker testified that, after driving Lindsey's car, Long said he was "glad [Lindsey] didn't leave a couple of bags of, you know, drugs in the car." Transcript at 132 (Testimony of Robert Mrak). Long testified that he never asked about Lindsey's job. From this evidence, a reasonable jury could conclude that Long knew Lindsey was paying for his cars with drug money.
 
 
 14
 The evidence of Goethke's knowledge is even more damning. In the sales of the 1987 Fleetwood to Taylor and the 1986 Cadillac to Davis, Goethke processed credit applications that used Carpets by Bob as a false place of employment. At trial, an IRS agent testified that, during the pre-indictment investigation of this case, Goethke told the government that he knew Carpets by Bob was a "front" that would verify the employment of drug dealers. Transcript at 1895 (Testimony of Agent Shoup). The same agent testified that Goethke admitted he processed John Taylor's credit application knowing it to be false and that on a different occasion he processed a false application for Davis. The jury certainly could infer from this evidence that Goethke knew Taylor and Davis were using drug money to purchase their vehicles.
 
 
 15
 The evidence of Bell's knowledge, however, is not nearly as strong. When Lindsey needed to use West Auto Brokers to obtain financing, he contacted Graham, not Bell. Likewise, when he made "under the table" payments and when he purchased paychecks, he dealt only with Graham, not Bell. Nevertheless, we find the evidence sufficient to support the jury's finding that Bell knew Lindsey was purchasing cars with drug money.
 
 
 16
 Lindsey testified that he financed the purchase of several automobiles using West Auto Brokers as a bogus place of employment and that each time he did so he had to pay Graham between $200 and $400. He also testified that on at least a couple of occasions, Graham told him that he split these payments with "the guy that runs the car lot," Transcript at 632 (Testimony of Lindsey), who Graham identified as "Gerry." Regarding Graham's check scheme, Lindsey testified that the "Independent Dealer's Agreement" was a sham from the beginning, that he never worked for West Auto Brokers, and that it was Graham who brought him the checks. Legitimate employees of West Auto Brokers also testified that Lindsey never had worked there. Bell, on the other hand, testified that the agreement was legitimate, that the checks were payment for Lindsey having done collection work and referring customers, and that he gave the checks to Lindsey in person.[12] If the jury accepted Lindsey's version of the facts, they certainly could conclude that Bell: (1) received a portion of Lindsey's "under the table" payments; (2) knew Lindsey did not have a legitimate job; (3) knew of the large amount of cash Lindsey was spending for his fake payroll checks and his numerous automobiles; and (4) lied to the grand jury. From these conclusions a reasonable jury could infer that Bell knew of, or at least was willfully blind to, the fact that Lindsey's money was drug money.
 
 
 17
 The appellants' second argument--that there is insufficient evidence that the transactions underlying their money laundering convictions were designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds" within the meaning of section 1956(a)(1)(B)(i)--is specious. The transactions that led to these convictions permitted Lindsey and other drug dealers to make drug money appear to be money earned through work in a legitimate job. These transactions were sufficiently shown by the government's evidence and they plainly fall within the purview of the statute.
 
 
 18
 Finally, as the jury was warranted in finding that these transactions indeed were designed to conceal the source of the proceeds, and as it was warranted in finding that the appellants knew the money involved was drug money, then it also was warranted in finding that the appellants knew these transactions were designed to conceal or disguise drug proceeds.
 
 
 19
 We conclude that appellants' substantive money laundering convictions are supported by the evidence.
 
 B.
 
 20
 We also reject the appellants' contention that their conspiracy convictions lack sufficient support in the evidence. Their first argument--that their substantive convictions are not supported by the evidence--we already have rejected. Their second argument--that there is insufficient evidence to show that they intended to join a conspiracy to launder money--is meritless. The evidence that supports their substantive convictions also supports the jury's finding that each appellant intended to join a single money laundering conspiracy.
 
 III.
 
 21
 We next consider Long's contention that the District Court erred in limiting its instruction on entrapment by estoppel to the conspiracy charge. He points out that since the mid-1970's his father had been cooperating with the government in an investigation of a drug dealer named Ralph Duke and that during the course of that investigation agents had told his father to continue doing business with Duke despite the fact that he was a suspected drug trafficker. Long therefore reasons that the entrapment by estoppel instruction should have applied to all his transactions, including those with Lindsey that gave rise to Count VI, because he had been told about the Duke investigation by his father, he was told to do business as usual with Duke, and he inferred from this "that he had no right not to deal with suspicious people." Long's Brief at 13.
 
 
 22
 Long's argument fails, as it rests on a misconception of the entrapment by estoppel defense. This defense "applies when an official tells the defendant that certain conduct is legal and the defendant believes the official." United States v. Austin, 915 F.2d 363, 366 (8th Cir.1990) (quoting United States v. Hsieh Hui Mei Chen, 754 F.2d 817, 825 (9th Cir.), cert. denied, 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985)), cert. denied, --- U.S. ----, 111 S.Ct. 1626, 113 L.Ed.2d 722 (1991). In this case, Long never was told, by his father or any government official, that he should do business with Lindsey or that his business with Lindsey was legal. Thus he cannot claim that he was convicted "for exercising a privilege which the State had clearly told him was available to him." Cox v. Louisiana, 379 U.S. 559, 571, 85 S.Ct. 476, 484, 13 L.Ed.2d 487 (1965) (quoting Raley v. Ohio, 360 U.S. 423, 426, 79 S.Ct. 1257, 1260, 3 L.Ed.2d 1344 (1959)). Accordingly, Long was not entitled to an estoppel instruction regarding his transactions with Lindsey.
 
 
 23
 Long also argues that the District Court erred by adding elements to the entrapment by estoppel defense that was given with respect to the conspiracy charge. We disagree. Even if Long was entitled to this instruction, a question as to which we have considerable doubt, we are satisfied that any error in the form of the instruction was harmless beyond a reasonable doubt.
 
 IV.
 
 24
 We turn to Long's argument that there was not a sufficient foundation for the District Court to instruct the jury on willful blindness.[13] We disagree. A willful blindness instruction is appropriate when the defendant asserts "a lack of guilty knowledge," but the evidence "support[s] an inference of deliberate ignorance." United States v. White, 794 F.2d 367, 371 (8th Cir.1986) (quoting United States v. McAllister, 747 F.2d 1273, 1275 (9th Cir.1984), cert. denied, 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 76 (1985)) (alteration added). "[I]n reviewing a district court's decision to give a willful blindness instruction, we must review the evidence and any reasonable inference from that evidence in the light most favorable to the government." United States v. Hiland, 909 F.2d 1114, 1131 (8th Cir.1990).
 
 
 25
 In this case, Long has maintained from the beginning that he lacked guilty knowledge. In fact, his proffered theory of defense instruction states that he "denies that he knowingly laundered narcotics money for David Lindsey," and "the government has not proved beyond a reasonable doubt that: he knowingly concealed or disguised the proceeds or transaction; he had knowledge the proceeds were from narcotics; nor that he acted with criminal intent." Long's Addendum at 13.
 
 
 26
 Moreover, there is evidence that supports the inference of deliberate ignorance. For example, Lindsey testified that he "was going to tell Tim [Long] about [his] deals with Terry Graham," but Long said that "[h]e didn't want to know." Transcript at 815, 816 (Testimony of Lindsey). Upon further examination Lindsey testified, "I was going to reveal what me and Terry [Graham] was doing.... But before I even got it started, Tim [Long] cut me off and he said he don't want to know." Id. at 816. Considering all the reasonable inferences from this evidence in the light most favorable to the government, there was a sufficient foundation for a willful blindness instruction, and the District Court thus did not err in its decision to give the instruction.
 
 V.
 
 27
 Long argues that his conviction should be reversed because the District Court did not give the jury his proffered theory of defense instructions. The government responds that the theory of defense instructions the court did give adequately and correctly covered the substance of Long's proffered instructions, and that the District Court's rejection of Long's instructions did not amount to an abuse of discretion. We agree with the government.
 
 
 28
 "The district court has wide discretion in formulating appropriate jury instructions. On appeal, this court evaluates the adequacy of instructions by reviewing them as a whole." United States v. McQuarry, 726 F.2d 401, 402 (8th Cir.1984) (per curiam) (citation omitted). Although "a defendant in a criminal case is entitled to a 'theory of defense' instruction if a timely request is made, the evidence supports the proffered instruction, and the instruction correctly states the law," he "is not entitled to a particularly-worded instruction when the instructions actually given by the trial court adequately and correctly cover the substance of the requested instruction." United States v. Lewis, 718 F.2d 883, 885 (8th Cir.1983).
 
 
 29
 Here Long's proffered instructions were long, redundant, and argumentative. The essence of his proffered instruction on Count I was that he never entered any criminal agreement, that he committed no act in furtherance of the conspiracy, and that he never acted with any criminal intent. The District Court instructed the jury that "Defendant Tim Long denies he conspired to launder money ..., denies he knowingly prepared any false credit applications, and denies counseling anyone to keep payments under $10,000." Transcript at 4526 (Jury Instructions). This instruction "adequately and correctly cover[s] the substance of the requested instruction." Lewis, 718 F.2d at 885. Moreover, having also considered the instructions on conspiracy, intent, and specific intent, we find the court's instructions correctly and adequately informed the jury of Long's theories of defense, properly stated the law, and did not in any way limit Long's ability to argue his innocence.
 
 
 30
 Similarly, the essence of Long's theory of defense instruction for Count VI was that he never knowingly laundered drug money, that he believed his conduct was legal, and that his conduct in fact was legal. The District Court instructed the jury that "[a]s to Counts IV, V, and VI, Tim Long denies knowingly laundering drug money, and contends that he acted legally and in good faith." Transcript at 4526 (Jury Instructions). Like the court's instruction for Count I, this instruction "adequately and correctly cover[s] the substance of the requested instruction." Lewis, 718 F.2d at 885. Moreover, it is clear upon review of the instructions as a whole, see, e.g., McQuarry, 726 F.2d at 402, that the District Court correctly and adequately informed the jury of Long's theories of defense, properly stated the law, and did not limit his ability to argue his innocence on any theory.
 
 VI.
 
 31
 Long's final contention is that the District Court erred by permitting the government to cross-examine him on matters that the government otherwise could not prove. He contends that these questions prejudiced his defense by "focus[ing] the jury's attention on inflammatory information," and by suggesting to the jury that he knew that all the alleged drug dealers involved in the case in fact were drug dealers. Long's Brief at 34. We need not decide whether the questions indeed were improper as it is clear that if it was error to permit the questioning, such error was harmless.
 
 
 32
 About midway into its cross-examination of Long, the government asked him whether it was true that he had told Goethke that Virgil Tolefree was a drug dealer. Prior to his counsel's objection, Long responded that he had not. During the bench conference following Long's objection, Long requested that the court strike the question and that it specifically instruct the jury to disregard it. The court granted these requests. Long did not move for a mistrial.
 
 
 33
 Later, the Assistant United States Attorney (AUSA) asked Long whether he knew that the People's Choice Bar was a bar frequented by St. Paul drug dealers. He responded that he did not. The AUSA then asked him, over objection, whether he ever had tried to go to the People's Choice Bar. He responded that he had not. Next, without objection, the AUSA asked him whether he ever had tried to enter the bar and whether he ever had gone to the bar. He replied that he had not. Then, again over objection, the AUSA asked him whether he had gone to the bar and been turned away. He replied that he had not. Finally, the AUSA asked over objection whether Long told Goethke that certain people were drug dealers including Tolefree, Lindsey, Davis, and Duke. Long denied that he had. He then joined in a motion for mistrial that was denied.
 
 
 34
 Long argues that it was error to permit these questions, and he insists that this error was prejudicial. In United States v. Clair, 934 F.2d 943 (8th Cir.1991), we were confronted with a similar claim of allegedly prejudicial prosecutorial misconduct during cross-examination. In that case Clair was on trial for attempting to distribute seventy pounds marijuana. At trial four eyewitnesses testified that they saw Clair load a plane with marijuana and then fly it to Arkansas. However, four times during his trial references also were made to the fact that he had intended to distribute another 800 pounds of marijuana. On the first occasion, defense counsel objected and the government withdrew its question. The other three times the court upheld defense objections and instructed the jury to disregard the questions. The court denied Clair's motion for a new trial.
 
 
 35
 On appeal we rejected Clair's argument that these references constituted prejudicial prosecutorial misconduct entitling him to a new trial. Citing the strength of the government's case, the cautionary instructions, and minimal prejudicial effect of the improper questions, we held that the district court did not abuse its discretion in denying Clair's motion for a new trial. Similar reasoning applies here.
 
 
 36
 Long argues that the allegedly improper cross-examination prejudiced him by implying that he knew certain people were drug dealers and that he willingly associated with them. However, Long objects to only four questions that occurred in the course of a month-long trial and to which he responded in the negative. In addition, pursuant to Long's request, the District Court struck the question about Virgil Tolefree and instructed the jury to disregard it, and it also explicitly instructed the jury that it could not consider as evidence a fact assumed in a question unless the witness agreed to the assertion made in the question. Most important, however, the evidence of Long's guilt is overwhelming. There is no dispute that Lindsey was a drug dealer or that he purchased his automobiles with drug money, and Long's co-workers testified that Long knew Lindsey was a drug dealer. Considering the alleged errors in context and in light of all the evidence against Long, we conclude that the District Court did not abuse its discretion in denying Long's motion for a new trial. See id. at 945-46.
 
 VII.
 
 37
 Goethke and Bell argue that the knowledge requirements of 18 U.S.C. § 1956 are unconstitutionally vague. "Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand. Regulation of economic activity, such as [auto sales], simply does not implicate the First Amendment." United States v. Antzoulatos, 962 F.2d 720, 726 (7th Cir.) (citations omitted), cert. denied, --- U.S. ----, 113 S.Ct. 331, --- L.Ed.2d ---- (1992). Moreover, a statute only need "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). A statute is not void simply because it could have been drafted more precisely. See, e.g., United States v. Powell, 423 U.S. 87, 94, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975). Measuring the appellants' vagueness arguments against these standards, we find these arguments meritless.
 
 
 38
 Section 1956(a)(1)(B)(i) prohibits a person from conducting a financial transaction "knowing that the property involved ... represents the proceeds of some form of unlawful activity," and "knowing that the transaction is designed ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." 18 U.S.C. § 1956(a)(1)(B)(i). We find nothing ambiguous with these requirements, and we therefore hold that the statute is not unconstitutionally vague. Moreover, Goethke and Bell conducted the transactions for which they were convicted knowing that the money involved was drug money and knowing that the transactions were designed to make this money appear to have a legitimate source. Given these facts, we conclude that Goethke and Bell had adequate notice that their conduct would be considered unlawful. We therefore reject any challenge to the constitutionality of the statute as applied to them.
 
 VIII.
 
 39
 Goethke and Bell also argue that application of section 1956 to this case contradicts federal civil rights laws because, in this case, the drug dealers for whom they laundered money happened to be black. This argument is frivolous and does not merit extended discussion. We think it sufficient merely to say that section 1956 contains no racial conditions or exclusions in its prohibition on the laundering of drug money.
 
 IX.
 
 40
 Goethke next contends that, because most of the evidence at trial was not relevant to his case, the District Court erred in denying his motion for severance. He argues that the failure to sever resulted in the jury's inability to compartmentalize the evidence, which, he insists, is the reason he was convicted on Count IX while James Long, his purportedly more culpable co-defendant, was acquitted. We disagree.
 
 
 41
 "A failure to grant severance will not be disturbed absent an abuse of discretion resulting in clear prejudice." United States v. Payne, 923 F.2d 595, 597 (8th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2830, 115 L.Ed.2d 1000 (1991). "Moreover, this circuit prefers conspiracy defendants to be tried together," id., and this preference "is not limited by any requirement that the evidence of each defendant's culpability be quantitatively or qualitatively equivalent." United States v. O'Connell, 841 F.2d 1408, 1432 (8th Cir.), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988) and 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989). Goethke and the other defendants were charged with conspiring to launder money. Contrary to Goethke's assertion, the fact that James Long was acquitted on Count IX is evidence that the jury was well able to compartmentalize the evidence. See, e.g., id. at 1433. The jury may have disbelieved Davis, the key witness against James Long, and therefore found that he never knew Davis's funds were "the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1). But the jury nevertheless could have reached a different conclusion regarding Goethke given that Goethke admitted he previously processed a credit application for Davis that he knew contained a false job at a company he knew was a front for drug dealers. Accordingly, as Goethke was charged as a member of a conspiracy, and as the jury appears to have been able to compartmentalize the evidence, we conclude that the denial of Goethke's motion for severance did not result in clear prejudice to him and that the District Court did not abuse its discretion by denying the motion.
 
 X.
 
 42
 Goethke's final claim is that incriminating statements he gave to government investigators were involuntary and therefore should have been suppressed. We review such a claim de novo and will find the statements involuntary only if, considering the totality of the circumstances, there is evidence that the "defendant was coerced or his will overborne." United States v. Wilson, 787 F.2d 375, 380-81 (8th Cir.), cert. denied, 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 and 479 U.S. 865, 107 S.Ct. 223, 93 L.Ed.2d 151 (1986). Upon review of the totality of the circumstances, we agree with the District Court and the magistrate[14] that Goethke's statements were made voluntarily.
 
 A.
 
 43
 Goethke argues that his statements were involuntary because he "was lead [sic] to believe that if he provided cooperation, that it would result in no prosecution for him." Goethke's Brief at 21. This argument is without substance. Goethke makes no effort to tell us how he allegedly "was lead to believe" that he would not be prosecuted, and nothing in the record supports the assertion that the government expressly or impliedly communicated that it would not indict Goethke if he cooperated. Although Goethke also relies on statements the government made after he had given his cooperation, he makes no effort to demonstrate how these statements influenced his decision to cooperate in the first place. Lacking a factual foundation, this claim must fail.
 
 B.
 
 44
 Goethke also argues that his statements were involuntary because, like the interrogator in Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), Agent Shoup, one of the agents who interviewed Goethke, befriended him falsely. In Spano, the defendant was a tense, emotionally unstable, foreign-born citizen of the United States with only a few months of high school education. He confessed to a murder after some eight hours of continuous interrogation by more than a dozen police officers. His repeated requests to see his attorney were denied. Ultimately, the police called upon an officer who had been his close friend for over eight years, "to play on [Spano's] sympathies" in order to get him to confess. Id. at 319, 79 S.Ct. at 1205. This did not work at first and had to be repeated four times before Spano finally confessed. In reversing Spano's conviction, the Supreme Court noted that the use of Spano's friend in the interrogation "is [a] factor which deserves mention in the totality of the situation." Id. at 323, 79 S.Ct. at 1207. Then, considering the totality of circumstances, the Court concluded that Spano's confession was involuntary because his will had been overborne.
 
 
 45
 Goethke's statements, however, were made in circumstances markedly different from those in Spano. Goethke made the challenged statements during six interviews with government agents between December 13, 1989, and July 27, 1990. Of these six interviews, three were conducted at Goethke's place of business, the other three at the FBI office, and all were scheduled for his convenience. Unlike Spano, Goethke was not in custody or under arrest at any point during these interviews, nor was he compelled to appear at any interview, to make himself available for questioning, or otherwise to answer any questions. He was free to terminate the questioning at any time, a freedom he in fact exercised on one occasion. The record supports the conclusion that Goethke is of at least average intelligence and that his will is not easily overborne. Finally, unlike Spano's interrogation, there was nothing overtly oppressive or coercive about any of Goethke's interviews. Thus, considering the totality of circumstances, even if we accept Goethke's claim that Agent Shoup falsely befriended him, we conclude that Goethke's statements were voluntary and properly admitted into evidence.
 
 XI.
 A.
 
 46
 Bell contends that his grand jury testimony should have been suppressed because it was the product of "subtle coercion." Bell's Brief at 26. The magistrate disagreed, finding the circumstances of Bell's grand jury testimony "virtually indistinguishable" from the circumstances in United States v. Washington, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), in which the Supreme Court rejected a similar argument. Report and Recommendation (Suppression of Statement) at 3 (Apr. 15, 1991). Moreover, the magistrate implicitly concluded that Bell's testimony had not been compelled. Accordingly, based upon Washington, the magistrate recommended that Bell's suppression motion be denied. The District Court agreed. Bell argues, however, that Washington is not controlling because, unlike the defendant in Washington, Bell was not asked if he wanted to assert or waive his rights.
 
 
 47
 We find this argument unpersuasive. In Washington the Supreme Court reasoned that "[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions. Accordingly, unless the record reveals some compulsion, ... incriminating [grand jury] testimony cannot conflict with any constitutional guarantees of the privilege." Washington, 431 U.S. at 187, 97 S.Ct. at 1818-19 (emphasis added). In this case, there is nothing to suggest coercion. To the contrary, Bell was advised of his rights in a clear and thorough manner shortly before he testified. He also stated that he understood these rights and that he did not have any questions. Based on our review of the record, we are satisfied that Bell's testimony was not coerced.
 
 B.
 
 48
 Bell argues alternatively that his grand jury testimony should have been suppressed because he did not receive an "Advice of Rights form," before he appeared before the grand jury. Bell's Brief at 30. He contends that the United States Attorney's Office (USAO) has a stated policy of providing these forms with all the subpoenas it issues. He then reasons that, as he did not receive a form prior to his appearance before the grand jury, the USAO violated its own stated policy and thereby denied him his Fifth Amendment due process.
 
 
 49
 The requirements of procedural due process apply only to "governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). Here there are no property interests involved, and thus the failure to provide Bell with an Advice of Rights form amounts to a violation of due process only if Bell had a liberty interest in its receipt. As we already have determined, Bell was advised of his rights once he appeared before the grand jury, he affirmed before he testified that he understood those rights, and his testimony therefore was not compelled or coerced. Thus, Bell's complaint that he did not receive the Advice of Rights form amounts to nothing more than a claim that he should have been advised of his rights before appearing before the grand jury. This asserted interest does not rise to the level of a liberty protected by the Due Process Clause of the Fifth Amendment. Bell's argument therefore fails.
 
 
 50
 We hold that the District Court properly denied Bell's motion to suppress his grand jury testimony.
 
 XII.
 
 51
 In Bell's final argument, he attacks the District Court's decision to enhance his base offense level pursuant to section 2S1.1(b)(1) of the sentencing guidelines.[15] United States Sentencing Commission, Guidelines Manual [hereinafter U.S.S.G.], § 2S1.1(b)(1) (Nov. 1990). That section provides for a three-level increase in a defendant's base offense level "[i]f the defendant knew that the [laundered] funds were the proceeds of an unlawful activity involving the manufacture, importation, or distribution of narcotics or other controlled substances." U.S.S.G. § 2S1.1(b)(1). Bell contends that, because he was charged with laundering drug money, an essential element of his crime was his knowledge that the laundered funds were the proceeds of narcotics distribution. Thus he reasons that to increase his offense level because he knew the money was drug proceeds constitutes improper double counting. We disagree.
 
 
 52
 Bell was convicted under 18 U.S.C. § 1956(a)(1)(B)(i). That section prohibits not just the laundering of drug money, but the laundering of any proceeds from a myriad of specified unlawful activities, many of which have nothing to do with narcotics sales. See 18 U.S.C. § 1956(c)(7) (1988). Thus, rather than resulting in double counting as Bell alleges, section 2S1.1(b)(1) distinguishes between classes of money launderers, punishing more severely those who knowingly launder proceeds from narcotics sales. Accordingly, we hold that the enhancement of Bell's sentence under section 2S1.1(b)(1) did not result in improper double counting.
 
 XIII.
 
 53
 Finally, the government argues in its cross-appeal that the District Court's decision to depart downward in sentencing Long is unsupported by the record. Under the applicable guidelines, Long's sentencing range was forty-six to fifty-seven months. However, based upon the reports of four doctors and testimony of one of them, the court concluded that "Long suffers 'an extraordinary physical impairment,' as that term is defined in the guidelines, which leaves him exceedingly vulnerable to possible victimization and resultant severe and possibly fatal injuries were the Court to impose a sentence of incarceration." Long's Sentencing Transcript at 19-20. It therefore sentenced him to five years of probation, including one year of home detention and 300 hours of community service. It also fined him $100,000. On appeal, the government does not dispute the court's conclusion that extreme physical impairment resulting in exceeding vulnerability constitutes a legitimate basis for departure, nor does it challenge the extent of the departure. Rather, its principal argument is an attack upon the District Court's finding that Long's physical injuries leave him exceptionally vulnerable to attack in prison.
 
 
 54
 A District Court may impose a sentence outside the guidelines range only if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b) (1988). In reviewing such a departure,
 
 
 55
 [w]e first evaluate, as a matter of law, whether the circumstances relied upon by the district court are unusual enough to warrant departure. We then consider whether the district court clearly erred in finding the historical facts that could justify departure. And lastly we sum up the inquiry by evaluating the reasonableness of the sentence--giving due deference to the sentencing court's superior position and considering the statutory goals of sentencing.
 
 
 56
 United States v. Smith, 909 F.2d 1164, 1169 (8th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 691, 112 L.Ed.2d 682 (1991).
 
 
 57
 In this case, the first question is not in dispute, and even if it were, we would find the circumstances relied upon by the District Court sufficiently unusual to warrant departure. The guidelines themselves provide that "[p]hysical condition is not ordinarily relevant in determining whether a sentence should be outside the guidelines." U.S.S.G. § 5H1.4, p.s. (Nov. 1990). Nevertheless "an extraordinary physical impairment may be a reason to impose a sentence other than imprisonment." Id. Moreover, at least one other circuit has held that "[e]xtreme vulnerability of criminal defendants is a factor that was not adequately considered by the Commission and a proper ground for departure under § 3553(b)." United States v. Lara, 905 F.2d 599, 605 (2nd Cir.1990). We agree with the District Court that an extraordinary physical impairment that results in extreme vulnerability is a legitimate basis for departure.
 
 
 58
 The government contends, however, that the District Court clearly erred in making the factual findings upon which it based its departure. Specifically, it argues that the Bureau of Prisons could adequately protect Long and thus the court clearly erred in finding Long "exceedingly vulnerable to possible victimization and resultant severe and possibly fatal injuries." Long's Sentencing Transcript at 19-20. The government, however, never presented the District Court with evidence of the facilities available to Long in prison. See Appellee's Brief at 70.
 
 
 59
 In an attempt to overcome this shortcoming, the government reminds us that Long had the burden of justifying the downward departure and that he failed to do so because he did not demonstrate the inadequacy of prison facilities. Long did introduce, however, the reports of four doctors and the testimony of one of them; all of them stated that in prison he would be exceedingly vulnerable to victimization and potentially fatal injuries. Although these doctors may not have been familiar with the facilities available to Long in prison,[16] we do not believe the District Court committed clear error by relying upon these statements in concluding that "the imposition of a term of imprisonment could be the equivalent of a death sentence for Mr. Long." Long's Sentencing Transcript at 20. We therefore hold that the District Court did not clearly err in finding that Long's circumstances justified a downward departure that would exclude prison time.
 
 
 60
 The government does not challenge the reasonableness of Long's sentence, except to the extent that it challenges the departure itself. In any event, we find it reasonable that the District Court did not sentence Long to a prison term given its conclusion that his extraordinary physical impairment and resulting excessive vulnerability could convert such a sentence into a death sentence.
 
 XIV.
 
 61
 The challenged convictions and sentences are affirmed.
 
 
 
 [1]
 The Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota
 
 
 [2]
 Because Long, Bell, and Goethke are challenging their convictions, we discuss the evidence in the light most favorable to the government. See, e.g., United States v. Brown, 921 F.2d 785, 791 (8th Cir.1990)
 
 
 [3]
 We hereinafter refer to all the appellants by their last names, including Timothy Long. We use both first and last names to refer to other members of the Long family
 
 
 [4]
 Graham testified that the purchase price of the Mercedes was almost $65,000. Transcript at 2800 (Testimony of Graham). Lindsey testified that it cost $49,000. Transcript at 655 (Testimony of Lindsey). Because it is sufficient for our purpose to note that the car was expensive, we have used a lower figure in our discussion
 
 
 [5]
 Taylor paid Graham $400 for arranging his financing
 
 
 [6]
 Davis paid James Long $300 for arranging this financing
 
 
 [7]
 We have limited our background discussion to the primary facts underlying the convictions of Long, Goethke, and Bell
 
 
 [8]
 In February 1991, the grand jury originally indicted Long, Bell, and four alleged coconspirators on these charges. On April 3, 1991, it handed down a superseding indictment, adding Goethke as a defendant and removing one of the original alleged coconspirators, who had entered a plea agreement
 
 
 [9]
 Long was acquitted of three other money laundering charges. Bell was acquitted on one other charge of money laundering
 
 
 [10]
 18 U.S.C. § 1956(a)(1)(B)(i) (1988) provides:
 (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
 (B) knowing that the transaction is designed in whole or in part--
 (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity ...
 shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.
 
 
 [11]
 Bell also challenges his substantive money laundering convictions on the ground that the evidence failed to show that he knew about the money laundering at Long Cadillac and thus it failed to show that he willfully aided and abetted the laundering of money
 
 
 [12]
 Bell testified before the grand jury. His grand jury testimony was read into the record at trial
 
 
 [13]
 Long also challenges the instruction on the ground that: (1) it permitted the jury to infer both that he knew Lindsey's money was drug money and that he knew the transaction was designed to disguise the nature, source, ownership, or control of that money; (2) it was inconsistent with the defense of entrapment by estoppel; (3) it was inconsistent with the government's attempt to prove actual knowledge. We find these arguments meritless and not worthy of discussion
 
 
 [14]
 The Honorable Franklin L. Noel, United States Magistrate Judge for the District of Minnesota
 
 
 [15]
 Bell also argues that the District Court clearly erred by denying him a two-level reduction for acceptance of responsibility and a four-level reduction for playing a minimal role in the offense. However, we find the District Court's decisions amply supported by the record, and accordingly we see no value in further discussion of these claims
 
 
 [16]
 The doctor who did testify admitted that he was not familiar with the facilities available to Long in prison. The reports of the other three doctors do not address the issue