43 F.3d 1468
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Said Nouhad ADRA, Defendant-Appellant.
 No. 93-5797.
 United States Court of Appeals, Fourth Circuit.
 Argued May 11, 1994.
Decided Dec. 13, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Senior District Judge. (CR-93-187-A)
 ARGUED: Eric Anthony Welter, Reed, Smith, Shaw & McClay, Washington, DC, for appellant. Stephen P. Learned Asst. U.S. Atty., Tax Div., U.S. Dept. of Justice, Alexandria, VA, for appellee. ON BRIEF: Helen F. Fahey, U.S. Atty., Sarah M. Mortenson, Tax Division, U.S. Dept. of Justice, Alexandria, VA, for appellee.
 E.D.Va.
 AFFIRMED.
 Before NIEMEYER, Circuit Judge, PHILLIPS, Senior Circuit Judge, and ERWIN, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 PHILLIPS, Senior Circuit Judge:
 
 
 1
 Said Nouhad Adra appeals his convictions on money laundering, bank fraud, and currency structuring charges growing out of a series of transactions that he conducted while manager of an automobile leasing business. We find no reversible error among the various ones assigned and affirm the convictions on all counts.
 
 
 2
 * Assessed in the light most favorable to the Government, the evidence tended to show the following. Adra came to the United States from Kuwait in 1983. After engaging in his own business ventures for a while, in 1985 he entered into a business relationship with McLean Savings & Loan Association (the Bank) in Northern Virginia. The exact nature of the relationship over time is disputed by Adra and the Bank, but in ways irrelevant to this case. The critical, undisputed facts of the relationship are that in 1986 the Bank, at Adra's suggestion, set up a wholly owned subsidiary, operating under the trade name "Masterlease," to lease automobiles. Adra was made President of the subsidiary, with full authority to approve leases while operating within Bank guidelines. He was paid a salary and, eventually a 10percent bonus on the subsidiary's net income.
 
 
 3
 In this capacity, Adra devised a "residual value lease financing" program deliberately designed to cater to a high credit-risk lessee clientele. Its basic feature was the requirement of a down payment representing the mathematically determined present lease-end value of the leased automobile, with monthly lease payments then to be made over the leasehold term at the end of which title would pass to the lessee if all lease payments had been made. The down payments could be made in cash or cash and trade-in combinations.
 
 
 4
 The Bank provided financing for these transactions. In the typical arrangement, a car dealership would direct a potential lessee of one of its cars to Masterlease. Once Adra had approved the lessee's application and the car lease agreement had been executed, the Bank would transfer money to Masterlease's operating account from which Adra would draw checks to purchase the automobile, with title being taken in the Bank's name. If all went well, title was transferred from Bank to lessee at the end of the lease term; if not, the Bank absorbed whatever loss it might sustain by lessee default of whatever kind.
 
 
 5
 Overall things did not go well with the venture. In mid-1988, the Bank decided to get out of the car leasing business because of the "overall volume of delinquency," and Adra's relationship was terminated in August of that year.
 
 
 6
 Several transactions handled by Adra during the period of the Masterlease operation gave rise to the indictments and prosecutions in this case. Each involved a similar pattern in which a young male, accompanied by an older female, came to Masterlease to apply for lease of an automobile previously selected at a car dealership. On each occasion, the lease transaction was accomplished by having the companion, at Adra's direction, fill out the application with her own credit and income information as "nominee" of the actual lessee. The nominal lessee would not, however, make any part of the residual-value down payment nor any of the monthly lease payments, nor be given possession of the car. Instead, the actual lessee would make the payments (or so many of the monthly payments as were paid) and possess the car. The actual lessee in each of the transactions was, as it later developed, then engaged in drug trafficking. This was the general pattern; the details of each transaction require elaboration.
 
 
 7
 Two of the transactions that figure most critically in this case involved Valerie Williams, as nominal lessee, and Jeffrey Williams (no relation), as actual lessee. The details were given in the testimony of Valerie Williams as Government witness.
 
 
 8
 In August or September 1987, Valerie was asked by a friend to assist the friend's 22-year old nephew, Jeffrey, in leasing a Nissan Pathfinder. Valerie agreed. After visiting several car dealerships with no success, the two went, at Jeffrey's suggestion, to Adra's Masterlease office. There, Adra, after being introduced to Valerie, agreed to process a lease application and proceeded to direct a transaction in which Valerie filled out the application as nominal lessee and Jeffrey simply stood by until down payment time came. In Jeffrey's presence, Adra directed Valerie to misstate her annual income on the application "in order for the agreement to go through." Valerie did as directed, misstating her income as $31,000 when it was actually $22,000. When the application was completed, Adra handed to Valerie a lease agreement for a Nissan Pathfinder. It required a $6,000 down payment, with monthly lease payments of $429 for five years, and a final payment of $5,413 in order to receive title at the end of the lease term. Valerie looked it over and in Adra's presence told Jeffrey that the price was "outrageous" and asked him where he was "going to get that kind of money." Jeffrey told her "not to worry, just sign it," which she did. Valerie never took possession of the leased Nissan nor made any payments under the lease agreement. As they left Adra's office, Jeffrey left a bag, which Valerie assumed contained the required $6,000 payment, on Adra's desk. Jeffrey took possession of the car.
 
 
 9
 Nine months later, Jeffrey asked Valerie to help him lease a Mercedes coupe. She declined at first because she was already the nominal lessee of the Nissan Pathfinder that Jeffrey was using as his own. She agreed, however, when Jeffrey explained that the Pathfinder lease would be transferred to one Michelle Smith, a girlfriend of his brother, Darryl Williams, thereby relieving Valerie of any potential liability on the Pathfinder lease.
 
 
 10
 In late May 1988, Valerie and Jeffrey went to the Masterlease office where they were joined by Darryl Williams and Michelle Smith. Adra again handled the transactions that followed. First, while Valerie waited in the lobby, he closed a new lease of the Nissan Pathfinder to Michelle. An agreement terminating the original Pathfinder lease was then given to Valerie for execution. It listed the payments received on that lease over the past nine months but required the nominal lessee (Valerie) to pay an additional $4,792 to "terminate" the lease. At the bottom it contained a statement that the lessee had paid this amount. Valerie signed as terminating lessee but she made no payment, nor did Adra ask her to do so.
 
 
 11
 Valerie and Jeffrey then went with Adra to his office to close the new Mercedes lease. Valerie was again given an application which required credit and income information. As she had on the Pathfinder lease application, she substantially overstated her income at Adra's direction. When she told Adra that recent financial problems due to a separation had caused her to become delinquent on several credit accounts, Adra told her to indicate on the application that pregnancy had caused the delinquencies and that arrangements had been made to pay the outstanding bills on a monthly basis. None of this was true, but Valerie complied and signed the application as falsified with respect to both her income and her credit situation.
 
 
 12
 The lease agreement then presented for Valerie's execution as nominal lessee called for a down payment of $42,750 and monthly lease payments of $945 for five years. Again, she expressed concern to Jeffrey about the amounts involved, specifically noting that the size of the monthly payments might cause the car to be repossessed and "mess up her credit." And, pointing to the $42,750 down payment figure, she asked Jeffrey, in Adra's presence, "how was he going to make a downpayment like that?" Again, as he had in connection with the Pathfinder lease, Jeffrey told her not to worry about it.
 
 
 13
 In Valerie's presence, Jeffrey gave a sum of money to a person in the Masterlease office who went with another into an adjoining room where they counted the money. As they counted, Jeffrey expressed his concern to Adra that he, Jeffrey, be given full credit for the money he had just delivered although he was not identified on any of the lease transaction documents. Adra assured him that he would be properly credited with the payments, but that this would show up in a number of increments of $9,000-plus; that Adra couldn't deposit more than that at one time because anything more would be reported to IRS.
 
 
 14
 As with the Pathfinder lease, Valerie never made any of the required payments nor ever physically possessed the Mercedes. When default on the monthly payments later occurred, the Bank repossessed the Mercedes, sustaining a loss of $11,224 on the transaction.
 
 
 15
 Financial records disclosed the following transactions related to the structuring of the $42,750 down payment that was reflected in the lease agreement. Euro Motorcars, the car dealership that sold the Mercedes to the Bank, received two cash payments a week apart: one for $9,500, the other for $9,542. Each was credited on Masterlease records for the benefit of Valerie Williams, though she made no such payments. A cashier's check for $9,500 ostensibly drawn by Valerie Williams, but never obtained by her, was deposited in the Masterlease's account. These sums plus the $4,792 that Adra required Valerie falsely to indicate she had paid to terminate the Pathfinder lease, and a standard dealer rebate of $9,413 given by Euro Motorcars to the Bank and passed on to the lessee, account for the $42,750 down payment figure.
 
 
 16
 The cash paid by Jeffrey Williams in these two transactions was proven to be the proceeds of drug trafficking.
 
 
 17
 Two other transactions involving others than the Williams' with Adra shared similar characteristics. The first was detailed in the testimony of Government witness Tracy Pinkney (at the time, Proctor).
 
 
 18
 In August 1987, Proctor had gone with her 21-year old friend, Ricardo George, to the Masterlease office for the purpose of completing a leasing arrangement on a 735 BMW that George was already driving on a purchase order and lease agreement signed by Proctor with another company. At the Masterlease office, George introduced Proctor to Adra, who then directed the processing of a lease application and agreement with Proctor as nominal lessee. When Proctor listed her after-tax monthly income on the application as $800, Adra told her to increase the figure to $3,200 "because it would look good to the Bank." As she was filling out the application, Adra told her to use a monthly pre-tax income figure of $4,041. When given the lease agreement to review and sign, Proctor asked Ricardo George whether he "could afford" the indicated monthly payment of $1,019, to which he responded that she should not worry about it. After Proctor had signed the lease, Adra congratulated her on her new BMW. When she replied that it wasn't hers, Adra responded that he knew that, and then congratulated George.
 
 
 19
 Tracy Proctor Pinkney never made any payment on the leased car or took possession of it. Eventually it was repossessed for default in payments, resulting in a $12,537 loss to the Bank.
 
 
 20
 The final transaction detailed in the Government's evidence occurred in April 1988. As described in the testimony of Stephenson McArthur, a previously convicted drug dealer, who participated in the transaction, it followed an unsuccessful effort by McArthur to lease a Nissan ZX300 from Martin's Nissan using one Karen Hubbard as nominal lessee. When Hubbard's credit was not satisfactory to Martin's Nissan, one of that dealership's sales people referred McArthur to Adra/Masterlease. When McArthur arrived at the Masterlease office in April 1988, Adra was expecting him and had prepared a lease agreement for Karen Hubbard's execution as nominal lessee. The lease called for a down payment of $6,500. McArthur gave Adra $7,500 in $20, $50, and $100 bills pulled from his pocket; according to McArthur, the extra $1,000 was payment to Adra" to have the lease and everything done up." Adra counted out the money, and gave McArthur a receipt for $6,500 in the name of Karen Hubbard.
 
 
 21
 When Karen Hubbard arrived shortly thereafter, she signed a credit application and lease agreement as nominal lessee. Adra then handed a copy of the documents to McArthur and told him to enjoy the car. McArthur was arrested on drug trafficking charges a few months later.
 
 
 22
 Adra was indicted in a six-count indictment in April, 1993. Count One charged him with conspiracy to commit bank fraud in violation of 18 U.S.C. Sec. 371, and Counts Two, Three and Four charged substantive acts of bank fraud in violation of 18 U.S.C. Sec. 1344(1) and (2), in connection with the three transactions involving Proctor and Valerie Williams respectively as nominal lessees. Count Five charged money laundering in violation of 18 U.S.C. # 8E8E # 1956(a)(1)(B)(i) and (ii), in connection with the May, 1988 Mercedes lease transaction. Count Six charged transaction structuring to evade a reporting requirement in violation of 31 U.S.C. Secs. 5324(a)(3) and 5322(a), in connection with the May, 1988, Mercedes lease transaction.
 
 
 23
 During a one day jury trial in July, 1993, Adra testified in his own defense, essentially denying that any of the transactions occurred as the Government's evidence indicated, and specifically denying any criminal conduct on his part in the matters charged. The jury found him guilty on all six counts, and this appeal followed. Adra challenges his conviction on each of the counts. We take them in order.
 
 II
 
 24
 Adra challenges the sufficiency of the evidence to convict him on the one bank fraud conspiracy and three substantive bank fraud counts (Counts One-Four) under the general conspiracy statute, 18 U.S.C. Sec. 371 and the specific bank fraud statute, 18 U.S.C. Sec. 1344(1), (2),[1] respectively. The challenge is without merit. Under the familiar test of Jackson v. Virginia, 443 U.S. 307, 319 (1979), "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the evidence readily sufficed to support the convictions on each of these counts.
 
 
 25
 The conspiracy charged to Adra was the scheme in which he participated with various nominal and actual lessees to defraud the Bank by inducing it to finance purchase of the leased cars by intentionally misstating the incomes and credit standing of the nominal lessees. The three substantive acts of fraud charged were the two transactions involving Valerie Williams and the one transaction involving Tracy Proctor (Pinkney) as nominal lessees.
 
 
 26
 The Bank's president testified, without contradiction, that Adra's conduct in arranging leases to nominal lessees who paid nothing and never, to his knowledge, took possession of the cars, and in causing the nominal lessees to falsify their income and credit conditions violated leasing and financing policies of the Bank which were known to Adra. The evidence was undisputed that the Bank lost approximately $23,000 from two of the transactions. Adra's contention in the face of this uncontradicted evidence is that it is insufficient to prove his intent to defraud the Bank, given the fact that the nominal lessees remained liable to the Bank. This argument is specious. The evidence obviously sufficed to permit a rational jury finding that Adra and his co-conspirators participated in a scheme to make false representations to a banking institution with the purpose of influencing it to finance the car leases. It as obviously sufficed to support rational findings that Adra executed this scheme on the three specific occasions charged in the substantive bank fraud counts.
 
 III
 
 27
 Adra next challenges the sufficiency of the evidence to convict him on the Count Five charge of money laundering in violation of 18 U.S.C. Secs. 1956(a)(1)(B)(i) and (ii)[2] in connection with the May, 1988 Mercedes lease transaction. Again, we conclude that the evidence was sufficient to convict on this count, and that the district court therefore did not err in refusing to direct acquittal on it.
 
 
 28
 To convict a defendant of conducting a "money laundering" financial transaction under this statute, the Government must prove that (1) the funds involved in the transaction were the "proceeds of specified unlawful activity"; (2) the defendant knew that they were "the proceeds of some form of unlawful activity;" and (3) the transaction was intended by the defendant either (i) to conceal or disguise the proceeds' nature, source, control, location, or ownership, or (ii) to avoid a federal reporting requirement. 18 U.S.C. Sec. 1956. See United States v. Campbell, 977 F.2d 854, 856-57 (4th Cir.1992). Adra concedes sufficiency of the evidence to prove elements (1) and (3). He challenges only its sufficiency to prove his knowledge that the funds provided by Jeffrey Williams in the May, 1988 Mercedes lease transaction were "the proceeds of some form of unlawful activity." As to that element, the proof may be either that the defendant had actual knowledge of the requisite fact or that he was "wilfully blind" to its existence. Id. at 857. Here, we are satisfied the evidence was sufficient to support a rational jury finding of Adra's actual knowledge[3] that the funds given him by Jeffrey Williams as down payment on the Mercedes lease were "the proceeds of some form of unlawful activity."
 
 
 29
 When, as here, the alleged "launderer" is not the source of the tainted proceeds, it obviously may be more difficult to prove his knowledge of taint from "some form of unlawful activity" than it is when the alleged launderer is himself the source. See United States v. Antzoulatos, 962 F.2d 720, 724 (7th Cir.1992). Yet it can be done: most readily by direct evidence that the non-source launderer was told of the taint, either by the source himself, see, e.g., United States v. Isabel, 945 F.2d 1193, 1202 (1st Cir.1991), or by others, see, e.g., United States v. Kaufmann, 985 F.2d 884, 893 (7th Cir.1993), but also by sufficiently probative circumstantial evidence. See, e.g., United States v. Carr, 25 F.3d 1194, 1205 (3rd Cir.1994) (properly inferable from opportunity necessarily provided to launderer to know of taint by launderer's intimate association with source); United States v. Long, 977 F.2d 1264, 1269-70 (8th Cir.1992) (properly inferable from non-source launderer's provision of phony job to source which he then sought to cover by lying to grand jury).
 
 
 30
 Here, there concededly is no direct evidence that Adra actually knew, either from his own observation or from information supplied by the source or others, that Jeffrey Williams' downpayment came from "some form of unlawful activity." Adra relies on this lack of direct evidence in urging the overall insufficiency of the evidence on the knowledge element.
 
 
 31
 We are satisfied, however, that there was sufficient circumstantial evidence from which the jury rationally could have found the requisite knowledge beyond a reasonable doubt by drawing reasonable inferences from Adra's conduct and that of others in his presence. Cf. United States v. Ratzlaf, --- U.S. # 6D6D 6D# , 114 S.Ct. 655, 663 n. 19 (1994) (citing Spies v. United States, 317 U.S. 492, 499-500 (1943)).
 
 
 32
 Principally, there was the evidence that Williams, a visibly youthful twenty-two year old, who just nine months earlier had been able to make a $6,000 cash down payment to Adra, was able on the occasion in question to make another of around $33,000. That these sums might have been earned from lawful income or represented lawfully acquired capital assets was belied by the subterfuge, whose details were directed by Adra, of using another's financial statement to avoid making disclosure of Jeffrey's income and capital assets. From this device, the jury might rationally infer that both Jeffrey and Adra knew that Jeffrey could not report--as his nominee could--any lawful source for so significant a sum of money. The inference that Adra necessarily knew that the funds were derived from some form of unlawful activity is bolstered by Jeffrey's willingness--although with manifested anxiety--to put them at risk in a transaction whose documentary record did not recognize his entitlement to credit for them. Had he been able to report a lawful source--either from income, or gift, or capital--it is inconceivable as a matter of common sense that he would have run such a risk rather than going through a direct lease transaction in which his financial interest would have been fully documented. And a jury, applying its own experience and common sense in the matter, rationally could infer that Adra, necessarily drawing the same inferences, must have known of the money's acquisition "from some form of unlawful activity." We therefore reject Adra's contention that the evidence was insufficient to convict him on this count.
 
 IV
 
 33
 Adra next challenges his conviction for currency structuring in violation of 31 U.S.C. Secs. 5324(a)(3) and 5322(a)[4] on two grounds: erroneous jury instruction and insufficiency of the evidence to support the jury's verdict. We take these in order.
 
 
 34
 * In Ratzlaf v. United States, --- U.S. ----, 114 S.Ct. 655 (1994), decided while this appeal was pending, the Supreme Court held that the willfulness element in Sec. 5322(a) requires that to convict under that section and Sec. 5324, the Government must prove that the defendant "knew the structuring in which he engaged was unlawful." Id. at 663. Because the trial judge had instructed the jury that to convict the defendant the Government need only prove that he knew of the financial institution's reporting obligation and that he had attempted to evade it, but not that he knew his structuring attempt was illegal, the court reversed and remanded.
 
 
 35
 Adra contends that the jury instruction in his case suffered the same vice and requires reversal and remand. We disagree. We believe that in total compass, the instruction here satisfied Ratzlaf's requirement.
 
 
 36
 The court began by instructing the jury that:
 
 
 37
 "The terms 'willfully' and 'knowingly' are used throughout these instructions and they are elements of each offense. An act is done willfully that is done voluntarily and intentionally, and with the specific intent to do something the law forbid[s]; that is, with the purpose to disobey or disregard the law."
 
 
 38
 J.A. 246-47 (emphasis added). Subsequently, the court gave the specific elements necessary for a conviction under Secs. 5324(a)(3) and 5322:
 
 
 39
 "In order to prove the crime of structuring ... the government must establish beyond a reasonable doubt the following essential elements: First, that the defendant had knowledge of the currency transaction reporting requirements. Second, the defendant, with such knowledge, knowingly and willfully structured or assisted in structuring or attempted to structure or assist in structuring any transaction".
 
 
 40
 J.A. 263 (emphasis added).
 
 
 41
 Taken together, these instructions contain the critical element the Supreme Court found missing in Ratzlaf, namely, that the Government must prove not only that Adra knew that financial institutions must report currency transactions in excess of $10,000, but, in addition, that he knew it was illegal to "structure" a transaction so as to avoid the necessity of complying with the reporting requirements.[5] See United States v. Walker, 25 F.3d 540, 548 (7th Cir.1994) (comparable instructions upheld under Ratzlaf requirement).
 
 B
 
 42
 Adra's further contention that there was insufficient evidence to support the requisite jury finding that he knew the structuring he undertook was unlawful is without merit.
 
 
 43
 There was abundant evidence adduced at trial demonstrating Adra's knowledge of--indeed, intimate familiarity with--the currency transaction laws and regulations at issue. He had worked for the Bank in a position that required him to know their details and purposes, and had in fact filled out the required currency transaction reports for the Bank. In addition, Adra actively directed the structured transaction at issue, exercising his sole control of the way in which the funds yielded would be deposited to avoid the reporting requirements as part of the laundering scheme. The jury here rationally could find the requisite knowledge on Adra's part that the structuring in which he was engaged was unlawful "by drawing reasonable inferences from the evidence of [his] conduct." Ratzlaf, 114 S.Ct. at 663 n. 19.
 
 V
 
 44
 Adra finally challenges as prejudicial error the district court's failure to give a limiting or curative instruction following the Government's elicitation from Adra on cross-examination of the details of a conversation Adra had had with a Government agent several years after the events at issue, and the admission in evidence of some "mug shots" of Ricardo George and Jeffrey Williams.
 
 
 45
 Because there was no objection as to either of these matters at trial, they could only be the basis for reversal if we could conclude they were "plain error" under Fed.R.Crim.P. 52. We cannot. If error at all, they could not qualify as "plain" under the exacting standard of United States v. Olano, --- U.S. # 6D 6D6D# , 113 S.Ct. 1770, 1776-79 (1993).
 
 VI
 
 46
 There having been no reversible error among those assigned, the convictions are
 
 
 47
 AFFIRMED.
 
 
 
 [1]
 "Whoever knowingly executes, or attempts to execute, a scheme or artifice--(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. Sec. 1344
 
 
 [2]
 "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... (B) knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or (ii) the control of the proceeds of specified unlawful activity; or to avoid a transaction reporting requirement under State or Federal law." 18 U.S.C. Sec. 1956(a)(1)(B)(i) and (ii)
 
 
 [3]
 Though, as indicated, our precedents permit proof of the requisite knowledge by proof of "willful blindness," the district court did not, as requested by the Government, so instruct the jury in this case. This raises the question whether, in the absence of such an instruction, a jury finding of the requisite knowledge could nevertheless be upheld as adequately supported by sufficient evidence of willful blindness though not of actual knowledge. Although we would be disposed, in the absence of direct circuit precedent, to believe that it could be, we need not now decide the question. The Government at oral argument indicated its willingness to stand on the sufficiency of the evidence to prove actual knowledge and we have so assessed it. The evidence of course easily suffices to support a finding of willful blindness
 
 
 [4]
 31 U.S.C. Sec. 5324 provides, in relevant part: "No person shall for the purpose of evading the reporting requirements of section 5313(a) ... with respect to such transaction cause or attempt to cause a domestic financial institution to fail to file a report required under Sec. 5313(a)." Section 5313(a), and its corresponding regulation in 31 C.F.R. Sec. 103.22(a), in turn require a financial institution to report any cash transactions involving more than $10,000 to the Internal Revenue Service. 31 U.S.C. Sec. 5322(a) then provides "A person willfully violating this subchapter or a regulation prescribed under this subchapter [31 U.S.C. Secs. 5311-5328] ... shall be fined not more than $250,000, or imprisoned for not more than five years, or both."
 
 
 [5]
 We note that the district court's "willfulness" instruction here differs critically from that we found violative of Ratzlaf in United States v. Rogers, 18 F.3d 265 (4th Cir.1994). In Rogers the trial court had instructed the jury: "Willful means no more than the Defendant charged with the duty knows what he is doing. It does not mean, in addition, he must suppose he is breaking the law." Id. at 267 (emphasis added)