**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gregory L. MYERS, Defendant–**
**Appellant.**

No. 95–6294.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 22, 1996.

Decided Aug. 6, 1997.

Paul W. Laymon, Jr. (argued and briefed), Office of U.S. Attorney, Chattanooga, TN, for Plaintiff–Appellee.

Charles P. Dupree (argued and briefed), Chattanooga, TN, for Defendant–Appellant.

Before: MARTIN, Chief Judge; WELLFORD and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which BOYCE F. MARTIN, Jr., C.J., joined. WELLFORD, J. (p. 365), delivered a separate concurring opinion.

## OPINION

MOORE, Circuit Judge.

Defendant–Appellant Gregory L. Myers appeals from a jury verdict finding him guilty of aiding and abetting possession with intent to distribute cocaine base ("crack"), a violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. He contends that the district court erred by (1) admitting his grand jury testimony, (2) admitting prior drug transactions in violation of Federal Rule of Evidence 404(b), and (3) increasing his sentence by including prior drug transactions in the "relevant conduct" analysis. Because the district court did not commit reversible error, we affirm.

## I. BACKGROUND

On February 9, 1993, Myers was driving an automobile in Chattanooga, Tennessee with passengers Kelvin Smith in the front seat and Wendell Herron in the back seat. Officer Bobby Dodd of the Chattanooga Police Department stopped the automobile after noticing its expired registration. Officer Dodd then called in the violation and was informed by the dispatcher that Myers's driving privileges had been revoked. Dodd planned to write Myers a citation for the expired registration and allow one of the passengers to drive the automobile. At that point, Smith produced a driver's license and offered to drive. After calling in Smith's driver's license, Officer Dodd learned from the dispatcher that there was a warrant out for Smith's arrest on another charge. Smith was then arrested.

Smith had three bags of crack cocaine, totaling 18.9 grams, in his back pocket. He also had $125 and a set of computerized measuring scales in a pocket of his leather jacket. Under Smith's seat, the officers found more crack cocaine and a 9 mm semi-automatic pistol.

Myers was arrested for driving on a revoked license, and the officers then found $1771 on him. The man in the back seat had no drugs, money, or weapons on himself. He was not charged with any crime and nothing else concerning him is in the record. At the police department, Smith admitted that the drugs found in his pocket were his, but he denied ownership of the crack cocaine and pistol found under his seat.

Smith was indicted on January 11, 1994, on cocaine and weapons charges. He subsequently pleaded guilty to offenses involving the crack cocaine and the pistol and was sentenced to 123 months of incarceration. Myers was not indicted with Smith but was subpoenaed to appear before the same grand jury to testify on January 11, 1994. Although Myers was considered a suspect at this time, the government contends there was insufficient information from which to secure an indictment. Myers was not furnished with a target letter informing him of his status as a suspect. Prior to his testimony, the following on-the-record exchange between the Assistant United States Attorney ("AUSA") and Myers occurred:

[Q]: You have the right to refuse to answer any question if it would incriminate you. Do you understand that?

A. (Nodding head up and down.)

Q. I need a verbal answer, please.

A. Yeah.

Q. Okay. You have a right to consult with an attorney. Do you understand that?

A. Yes.

Q. Okay. Anything you say can be used against you. Do you understand that?

A. Yes.

Supplemental Joint Appendix (Supp. J.A.) at 14. He was not told, however, that if he could not afford a lawyer, one would be provided for him; nor was he told that he was a target or subject of the grand jury investigation. He then gave a lengthy statement to the grand jury. Supp. J.A. at 15–27.

After Smith pleaded guilty, he agreed to testify truthfully against Myers, and his tes-

timony helped lead to Myers's indictment, which was handed down on January 24, 1995. The indictment alleged that Myers possessed cocaine base with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and that he used and carried a firearm during and in relation to drug trafficking, in violation of 18 U.S.C. § 924(c). Both of these counts also alleged that Myers and Kelvin Smith were aided and abetted by each other in the commission of these acts, a violation of 18 U.S.C. § 2. Joint Appendix (J.A.) at 10–11.

Prior to trial, Myers moved to suppress his grand jury testimony, and the district court denied his motion. Also before trial, the government notified him that it planned to introduce evidence from witnesses who claimed that he had sold drugs to them at other times. Myers filed a motion in limine to exclude this evidence pursuant to Federal Rule of Evidence 404(b), and this motion was also denied.

At trial, Myers's grand jury testimony was entered into evidence. Additionally, Smith testified that he and Myers had been selling crack together since 1989, with their business growing over the years. J.A. at 119–43. According to Smith, the relationship ended when they had a falling out in November 1993. J.A. at 187–88. Three other witnesses, Eugene Cobbins, Gary King, and Luther Roberson, also testified that they had purchased cocaine from Myers at various times. Cobbins testified that he had purchased a quarter-ounce of crack cocaine from Myers in the early summer of 1993 and that a few weeks later he purchased a half-ounce of powder cocaine from him. J.A. at 196–99. King testified that Myers sold him a kilogram of powder cocaine in late 1993, J.A. at 214–15, and Roberson testified that Myers sold him four ounces of crack cocaine in late 1993. J.A. at 228–30.

The jury found Myers guilty of the drug charge, but acquitted him of the weapons charge. J.A. at 25. At the sentencing hearing, the district court found much of Myers's conduct, as chronicled in the testimony of Smith, Cobbins, King, and Roberson, to be relevant conduct under the United States Sentencing Guidelines and adjusted Myers's sentence accordingly. J.A. at 260. Myers then filed this timely appeal, contending that the trial court erred on two grounds by admitting his grand jury testimony. He first contends that he should have been given a "target letter" before his grand jury appearance indicating that he was a target of the ongoing investigation. He then argues that because he was not told that a lawyer would be appointed for him if he could not afford one, his grand jury testimony must be suppressed under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). According to him, had he been informed of his right to appointed counsel—a right that his argument presupposes he had—he would have exercised that right, and his counsel would have advised him not to incriminate himself. Myers also raises challenges to the admission of the Rule 404(b) evidence and to the district court's relevant conduct analysis.

## II. RIGHT TO A TARGET LETTER[1]

### A. Constitutional Right

■ Myers argues that because he was a target of the grand jury investigation, he had a constitutional right to a letter informing him of his target status prior to his testimony. The Supreme Court, however, has rejected this very argument. In *United States v. Washington*, 431 U.S. 181, 189, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977), the Court stated: "Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential-defendant warnings add nothing of value to protection of Fifth Amendment rights." *See also United States v. Gillespie*, 974 F.2d 796, 800 (7th Cir.1992) ("[The defendant] concedes—as he must—that target warnings are not constitutionally mandated.") (citing *Washington*, 431 U.S. at 189, 97 S.Ct. at 1819); *United States v. Goodwin*, 57 F.3d 815, 818 (9th Cir.1995) (same); *United States v. Pacheco–Ortiz*, 889 F.2d 301, 307 (1st Cir.1989) (same). In light

---

1. We note for clarity purposes that our analysis regarding Myers's right to a target letter is separate from our analysis regarding the adequacy of the warnings given and his related right-to-counsel claim.

of *Washington*'s pronouncements, Myers's argument that he had a constitutional right to a target letter fails.

## B. Department of Justice Policy

 It is the Department of Justice's policy to provide a letter and an Advice of Rights form to a "target" or "subject" of the grand jury investigation, warning the witness of his status as a target or subject and of his rights before the grand jury. *See* U.S. Dep't of Justice Manual § 9–11.150 (1992–1 Supp.).[2] The DOJ Manual also requires that the Advice of Rights warnings be read to the witness immediately prior to the witness's testimony before the grand jury. *Id.* A target is defined by the DOJ Manual as "a person as to whom the prosecutor or the grand jury has substantial evidence linking him/her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." *Id.* The Manual defines a subject of an investigation as "a person whose conduct is within the scope of the grand jury's investigation." *Id.* In this case, it is clear that Myers did not receive a target letter, J.A. at 41, and it appears that he did not receive an Advice of Rights form, J.A. at 32–34. The government, however, argues that is was not required to send either of these items to Myers. It asserts that Myers "was not a putative defendant" but that he was "arguably a suspect" and that "[i]t is not clear defendant was a target, although the government may have believed defendant was somehow criminally involved with Kelvin Smith." Appellee's Br. at 4, 8–9.

As an initial matter, we note the ambiguous nature of the government's statements in light of the fact that under the DOJ Manual, a witness cannot be a target without being a putative defendant. More importantly, we believe that Myers was both a target and a subject under the DOJ Manual's definitions. In addition to the government's admission in its brief that Myers was "arguably a suspect" and that "the government may have believed defendant was somehow criminally involved with Kelvin Smith[,]" an AUSA testified at the hearing to suppress Myers's grand jury testimony that part of the reason Myers was placed in front of the grand jury was because he was being investigated. J.A. at 47–48. Additionally, state charges that were then pending against Myers for the conduct that formed the basis of the federal charges were dismissed ten months prior to his grand jury testimony to allow the federal investigation to continue unhindered by the state proceeding. J.A. at 33. According to the AUSA, federal officials normally request that a state matter be dismissed "if it appeared that a matter was going to be brought to federal court for further investigation and/or indictment." J.A. at 45–46. Even more telling, the overwhelming majority of the questions asked Myers at the grand jury hearing concerned his own behavior and actions, not those of Kelvin Smith. Supp. J.A. at 15–27.

 Because Myers was both a target and a subject of the grand jury investigation, the government violated the mandate in the DOJ manual. Nevertheless, a violation by the government of its internal operating pro-

---

**2.** The Advice of Rights form reads as follows:

*Advice of Rights*

A. The grand jury is conducting an investigation of possible violations of federal criminal laws involving: (State here the general subject matter of inquiry, e.g., the conducting of an illegal gambling business in violation of 18 U.S.C. § 1955).

B. You may refuse to answer any question if a truthful answer to the question would tend to incriminate you.

C. Anything that you do say may be used against you by the grand jury or in a subsequent legal proceeding.

D. If you have retained counsel, the grand jury will permit you a reasonable opportunity to step outside the grand jury room to consult with counsel if you do so desire.

U.S. Dep't of Justice Manual § 9–11.150 (1992–1 Supp.). The Manual goes on to state that, "[i]n addition, these 'warnings' should be given by the prosecutor on the record before the grand jury and the witness should be asked to affirm that the witness understands them." *Id.* With respect to target letters, the Manual provides: "Although the Court in *Washington* ... held that 'targets' of the grand jury's investigation are entitled to no special warnings relative to their status as 'potential defendant[s]', the Department continues its longstanding internal practice to advise witnesses who are known 'targets' of the investigation that their conduct is being investigated for possible violation of federal criminal law." *Id.*

cedures, on its own, does not create a basis for suppressing Myers's grand jury testimony. "[T]he U.S. Attorney's Manual 'is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.'" *United States v. Goodwin*, 57 F.3d 815, 818 (9th Cir.1995) (quoting *United States v. Lorenzo*, 995 F.2d 1448, 1453 (9th Cir.1993) (in turn quoting U.S. Dep't of Justice Manual § 1–1.100)). Additionally, any interest a target or subject may have in receiving the Advice of Rights form does not, on its own, rise to the level of a liberty interest protected by the Due Process Clause. *See United States v. Long*, 977 F.2d 1264, 1276 (8th Cir.1992) ("[The witness's] complaint that he did not receive the Advice of Rights form amounts to nothing more than a claim that he should have been advised of his rights before appearing before the grand jury. This asserted interest does not rise to the level of a liberty protected by the Due Process Clause of the Fifth Amendment."); *Goodwin*, 57 F.3d at 818 (same).

■ In exceptional cases, our supervisory power exists as a tool to control prosecutorial misconduct before the grand jury. "In the exercise of its supervisory authority, a federal court 'may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.'" *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988) (quoting *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983)). The Second Circuit, in fact, in *United States v. Jacobs*, 547 F.2d 772, 778 (2d Cir.1976), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978), exercised its supervisory powers to suppress grand jury testimony that was obtained from a target who was not given the Advice of

Rights form and the accompanying warnings required by the DOJ Manual. In two cases subsequent to *Jacobs*, however, the Supreme Court has severely curtailed the ability of the federal courts to fashion remedies based upon their supervisory powers.

The Court in *Bank of Nova Scotia* held that "a federal court may not invoke supervisory power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)." 487 U.S. at 254, 108 S.Ct. at 2373. One of the rationales enunciated by the Court was that misconduct of the non-prejudicial variety can be corrected by "focus[ing] on the culpable individual rather than granting a windfall to the unprejudiced defendant." *Id.* at 263, 108 S.Ct. at 2378.[3]

*United States v. Williams*, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), imposed further limits on the federal courts' supervisory powers. In that case, the district court had dismissed an indictment because the government failed to disclose substantial exculpatory evidence in its possession to the grand jury. Despite a Tenth Circuit rule and provisions in the DOJ Manual[4] requiring the prosecutor to disclosure substantial exculpatory evidence about which the prosecutor is aware, a sharply divided Court held that the district court had improperly used its supervisory powers. *Id.* at 47, 112 S.Ct. at 1741. Essentially removing all general supervisory authority over the grand jury from the federal courts, the Court stated: "[W]e think it clear, that, as a general matter at least, no such 'supervisory' judicial authority [over grand jury functioning] exists, and that the disclosure rule applied here exceeded the Tenth Circuit's authority[,]" *id.*, and that "any power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they

3. Bank of Nova Scotia involved various violations of Federal Rule of Criminal Procedure 6 by the government. Suggesting possible sanctions for violations, the Court stated:

Errors of the kind alleged in these cases can be remedied adequately by means other than dismissal. For example, a knowing violation of Rule 6 may be punished as a contempt of court. See Fed. Rule Crim. Proc. 6(e)(2). In addition, the court may direct a prosecutor to

show cause why he should not be disciplined and request the bar or the Department of Justice to initiate disciplinary proceedings against him. The court may also chastise the prosecutor in a published opinion.
487 U.S. at 263.

4. See U.S. Dep't of Justice Manual § 9–11.223 (1992–1 Supp.). The Court in *Williams* did not even discuss this rule.

maintain over their own proceedings." *Id.* at 50, 112 S.Ct. at 1743. The central factor driving the Court's opinion was its understanding of the grand jury's position in our constitutional structure. The Court described the grand jury as "a constitutional fixture in its own right[,]" *id.* at 47, 112 S.Ct. at 1741 (quotation marks and citations omitted), and as a device that "belongs to no branch of the institutional Government." *Id.* Because "neither in this country nor in England has the suspect under investigation by the grand jury ever been thought to have a right to testify or to have exculpatory evidence presented," *id.* at 52, 112 S.Ct. at 1744 the Court reasoned that "[i]mposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with this system." *Id.*

Justices Stevens, Blackmun, O'Connor, and Thomas dissented, finding the majority approach "difficult to comprehend." *Id.* at 65, 112 S.Ct. at 1751.

> We do not protect the integrity and independence of the grand jury by closing our eyes to the countless forms of prosecutorial misconduct that may occur inside the secrecy of the grand jury room. After all, the grand jury is not merely an investigatory body; it also serves as a "protector of citizens against arbitrary and oppressive governmental action." . . . It blinks reality to say that the grand jury can adequately perform this important historic role if it is intentionally misled by the prosecutor—on whose knowledge of the law and facts of the underlying criminal investigation the jurors will, of necessity, rely.

*Id.* at 68, 112 S.Ct. at 1753 (internal citation omitted) (Stevens, J., dissenting).[5]

The First and the Seventh Circuits more recently have each dealt with the issue of the extent to which their supervisory powers could be used to suppress grand jury testimony when the government failed to comply with the relevant DOJ manual provisions regarding grand jury witnesses. In *United States v. Pacheco–Ortiz,* 889 F.2d 301 (1st Cir.1989), a case in which no warnings of any

kind were given, the court concluded that the lack of an affirmative misrepresentation of the witness's status by the government and the seemingly innocuous grand jury testimony by the witness tipped the scales against a finding that the evidence should have been suppressed. *Id.* at 309–10. Employing the harmless-error analysis found in *Bank of Nova Scotia,* the court also concluded that the defendant "was not harmed . . . in a way that warrant[ed] action adverse to the judgment on appeal." *Id.* at 311. The court was still concerned about the AUSA's behavior, however, and stated that it would, in the appropriate case, refer violations of the DOJ Manual to the Department's Office of Professional Responsibility. *Id.*

In *United States v. Gillespie,* 974 F.2d 796 (7th Cir.1992), although the government gave the witness an Advice of Rights form, it failed to warn the witness of his target status and failed to give the warnings orally immediately prior to the witness's testimony. Even with these failings, however, the Seventh Circuit refused to invoke its supervisory powers to suppress the grand jury testimony when there was no indication that the government acted in bad faith and the defendant had consulted with an attorney prior to appearing before the grand jury. *Id.* at 800–03. Recognizing the limits imposed by the recent Supreme Court cases, the court stated that "[f]ew restraints protect targets appearing before grand juries, particularly in the wake of *Williams.*" *Id.* at 801. Nonetheless, the court was troubled by the government's failure adequately to warn the defendant of his rights: "We are faced, then with 'the violation of a policy which does not justify a case-related judicial sanction and yet which appears immune to expressions of judicial dissatisfaction.'" *Id.* at 802 (quoting *Pacheco–Ortiz,* 889 F.2d at 310–11). Following the First Circuit in *Pacheco–Ortiz,* the Seventh Circuit warned that federal prosecutors should not be surprised if, in future cases, the court refers violators of the Department's internal policy to the Depart-

---

5. For another recent discussion regarding the modern-day grand jury and how it inadequately serves its historical protective function, see Andrew D. Leipold, *Why Grand Juries Do Not (And Cannot) Protect the Accused,* 80 Cornell L.Rev. 260 (1995).

ment's Office of Professional Responsibility. *Id.* at 802.

We, too, are troubled by the government's violations of the DOJ Manual. Although Myers was given oral warnings immediately prior to his testimony, the government should apply all its rules in a consistent manner with respect to targets appearing before the grand jury. Additionally, unlike the situations in *Pancheo–Ortiz* and *Gillespie*, Myers's grand jury testimony was not innocuous, and he had not first consulted with an attorney before testifying. We, unfortunately, feel constrained by the Supreme Court's recent decisions, especially *Williams*. If, "as a general matter, no such 'supervisory' judicial authority exists," *Williams*, 504 U.S. at 47, 112 S.Ct. at 1741 the government's failure to follow its own internal policy, without more, does not present an exceptional circumstance justifying the implementation of this power. Although a distinction could be made between *Williams* and the present dispute in that appellant in this case only seeks to have his grand jury testimony suppressed, not his indictment dismissed, we believe the Court's decision to restrict the scope of the federal courts' supervisory powers was not limited to the particular remedy of dismissal of an indictment. *See Gillespie*, 974 F.2d at 801 ("Although suppression of testimony is a less extreme sanction than the outright dismissal of the indictment contemplated in *Williams* and *Nova Scotia*, the reasoning undergirding those decisions is equally applicable here. The Supreme Court has delineated a very limited scope for our supervisory powers...."). Because Myers has not produced any evidence of bad faith on the part of the government and because he has not pointed to, nor have we found, any other exceptional circumstances, we cannot invoke our supervisory powers in this dispute

to suppress Myers's grand jury testimony. This conclusion, however, does not resolve whether the warnings were adequate as a matter of constitutional law.

## III. ADEQUACY OF THE WARNINGS

■ Myers asserts that the warnings he was given by the AUSA prior to his testimony before the grand jury were constitutionally inadequate in light of his target status.[6] He contends that the warnings insufficiently apprised him of his privilege against self-incrimination and did not inform him that he could have counsel appointed if he wished to do so. Particularly, he contends that if he had known he had a right to appointed counsel, he would have exercised that right, and the counsel in turn would have advised him to exercise his Fifth Amendment rights on any questions dealing with his personal involvement in the offense. Myers contends that a target's right to appointed counsel before the grand jury emanates from both the Fifth and Sixth Amendments.

■ Although the right to appointed counsel is encompassed within the Sixth Amendment, *Gideon v. Wainwright*, 372 U.S. 335, 339–40, 83 S.Ct. 792, 793–94, 9 L.Ed.2d 799 (1963), the Sixth Amendment right to counsel attaches only after judicial proceedings have been initiated against a defendant. *See, e.g., Moran v. Burbine*, 475 U.S. 412, 427, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410 (1986) ("It is clear, of course, that, absent a valid waiver, the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches."); *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972) ("[I]t has

---

**6.** Although we already have concluded that Myers was a target or a putative defendant under the DOJ Manual's definition, the few other circuits that have considered the definition of a target apart from the context of the DOJ Manual have developed slightly broader formulations than that found in the DOJ manual. *See United States v. Kilgroe*, 959 F.2d 802, 804 n. 2 (9th Cir.1992) ("A putative defendant is one against whom the Government already possesses incriminating evidence at the time of his appearance before a tribunal, or upon whom the Government

has focused as having committed a crime.") (quotation marks and citation omitted); *United States v. Crocker*, 568 F.2d 1049, 1053 (3d Cir. 1977) ("[T]he test as to whether a witness is a target of a grand jury investigation cannot be whether he 'necessarily' will be indicted, but whether according to an objective standard he could be indicted."). Because it is clear that Myers was a target even under the definition in the DOJ Manual, we need not decide in this case whether a less stringent definition should apply to cases not involving the DOJ Manual.

been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.") (plurality); *Sevier v. Turner,* 742 F.2d 262, 267 (6th Cir.1984) ("[O]nce adversary judicial criminal proceedings have commenced, the sixth amendment right to counsel attaches.").

Because Myers, although a target when he appeared before the grand jury, had not been formally charged, his Sixth Amendment right to counsel had not yet attached. *See United States v. Ramsey,* 785 F.2d 184, 193 (7th Cir.) ("The sixth amendment does not come into play until after the suspect becomes 'accused.' There is therefore no right to counsel before the grand jury . . . .") (internal citation omitted), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986); *United States v. Vasquez,* 675 F.2d 16, 17 (2d Cir.1982) ("While the government's investigation of Vasquez may have commenced when he was called before the grand jury for the first time, the fact that a person is the subject of an investigation is not enough to trigger his Sixth Amendment right to counsel."); *see also United States v. Mandujano,* 425 U.S. 564, 581, 96 S.Ct. 1768, 1778, 48 L.Ed.2d 212 (1976) (stating that a target appearing before a grand jury does not have a Sixth Amendment right to counsel) (plurality); *In re Groban,* 352 U.S. 330, 333, 77 S.Ct. 510, 513, 1 L.Ed.2d 376 (1957) ("A witness before a grand jury cannot insist, as a matter of constitutional right, on being represented by his counsel . . . .") (dictum); 1 SARA SUN BEALE & WILLIAM C. BRYSON, GRAND JURY LAW AND PRACTICE § 6:17 (1986) ("Although a majority of the Supreme Court has never ruled directly on this issue, the law is fairly well settled that the Sixth Amendment right to counsel is not triggered at the time a witness is called to testify before a grand jury, even if the witness is the target of the grand jury's investigation."); *but see Mandujano,* 425 U.S. at 602–03, 96 S.Ct. at 1788–89 (Brennan, J., concurring in the judgment) (contending that the plurality's statements regarding the lack of a Sixth Amendment right to counsel at the grand jury stage of a proceeding were based on dicta of dubious validity).

Turning to Myers's Fifth Amendment claim, it is well established that the Fifth Amendment privilege against self-incrimination extends to grand jury proceedings. *See,* e.g., *Counselman v. Hitchcock,* 142 U.S. 547, 562–63, 12 S.Ct. 195, 197–98, 35 L.Ed. 1110 (1892); *United States v. Calandra,* 414 U.S. 338, 346, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974); *United States v. Williams,* 504 U.S. 36, 49, 112 S.Ct. 1735, 1743, 118 L.Ed.2d 352 (1992). Indeed, "the privilege against self-incrimination can be asserted 'in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory.'" *Maness v. Meyers,* 419 U.S. 449, 464, 95 S.Ct. 584, 594, 42 L.Ed.2d 574 (1975) (quoting *Kastigar v. United States,* 406 U.S. 441, 444, 92 S.Ct. 1653, 1655, 32 L.Ed.2d 212 (1972)). Nonetheless, the privilege is normally not self-executing. As the Court stated in *Minnesota v. Murphy,* 465 U.S. 420, 429, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984), "a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself." In situations involving custodial interrogation, however, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The purpose of these various warnings before custodial interrogation is to ensure that the Fifth Amendment privilege against self-incrimination can be effectively exercised. *Id.*

As the Supreme Court and we have repeatedly reaffirmed, the Constitution requires that the full *Miranda* warnings only be given prior to custodial interrogation. *See United States v. Washington,* 431 U.S. 181, 187 n. 5, 97 S.Ct. 1814, 1818 n. 5, 52 L.Ed.2d 238 (1977) ("All *Miranda*'s safeguards, which are designed to avoid the coercive atmosphere, rest on the overbearing compulsion which the Court thought was caused by isolation of a suspect in police

custody."); *Roberts v. United States,* 445 U.S. 552, 560–61, 100 S.Ct. 1358, 1364–65, 63 L.Ed.2d 622 (1980) ("The [*Miranda*] warnings protect persons who, exposed to [custodial] interrogation without the assistance of counsel, otherwise might be unable to make a free and informed choice to remain silent."); *United States v. Warner,* 971 F.2d 1189, 1201 (6th Cir.1992) ("This court has repeatedly held that a person is not entitled to be notified of her *Miranda* rights before an interrogation if that person is not 'in custody.' ") (citations omitted); *See also United States v. Johnson,* 42 F.3d 1312, 1318 (10th Cir.1994) ("An accused's Fifth Amendment right to counsel attaches when he invokes that right during a custodial interrogation."), *cert. denied,* 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995); *Alexander v. Connecticut,* 917 F.2d 747, 751 (2d Cir.1990) ("It is the fifth amendment's prohibition against compelled self-incrimination which provides the constitutional underpinning for the prophylactic *Miranda* rules, including notice of the right to counsel. Absent a police dominated interrogation, the fifth amendment right to counsel does not attach."), *cert. denied,* 501 U.S. 1219, 111 S.Ct. 2831, 115 L.Ed.2d 1000 (1991).

▬ The issue thus becomes whether Myers's time before the grand jury constituted, or was equivalent to, custodial interrogation so as to entitle him to a complete rights warning, including a warning advising him of his right to appointed counsel. The Court has defined custody as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Minnesota v. Murphy,* 465 U.S. 420, 430, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984) (quotation marks and citations omitted). The Supreme Court has never decided whether the government's questioning of a target before the grand jury constitutes custodial interrogation, *see United States v. Washington,* 431 U.S. 181, 186, 97 S.Ct. 1814, 1817, 52 L.Ed.2d 238 (1977) ("[T]his Court has not decided that the grand jury setting presents coercive elements which compel witnesses to incriminate themselves. Nor have we decided whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses; moreover, we have no occasion to decide these matters today [because the warnings here were adequate.]"). The Supreme Court has, however, indicated in dictum and in a plurality opinion that warnings consisting of less than the full *Miranda* warnings would survive constitutional scrutiny.[7]

In *United States v. Mandujano,* 425 U.S. 564, 578–79, 96 S.Ct. 1768, 1777–78, 48 L.Ed.2d 212 (1976), the Court concluded that the Fifth Amendment privilege against self-incrimination did not require suppression of statements introduced in a perjury prosecution that were made by a grand jury witness, even though the witness was a putative defendant and was not given *Miranda* warnings. A four-justice plurality concluded that a complete *Miranda*-like rights warning is not required for a grand jury witness not in custody and that a witness appearing before a grand jury does not have a constitutional right to be represented by counsel. In reaching this conclusion, the plurality stated:

> The [lower] court's analysis, premised upon the prosecutor's failure to give *Miranda* warnings, erroneously applied the standards fashioned by this Court in *Miranda*. Those warnings were aimed at the evils seen by the Court as endemic to police interrogation of a person in custody. *Miranda* addressed extrajudicial confessions or admissions procured in a hostile, unfamiliar environment which lacked procedural safeguards. The decision expressly rested on the privilege against compulsory self-incrimination; the prescribed warnings sought to negate the "compulsion" thought to be inherent in police station interrogation. But the *Miranda* Court simply did not perceive judicial inquiries and custodial interrogation as equivalents: "[T]he compulsion to speak in the isolated setting of the police station may well be greater than in courts or other

7. It is clear that a warning identical to the one required by *Miranda* could not be required in the grand jury setting because, unlike witnesses subject to custodial interrogation, witnesses appear-ing before a grand jury do not have an absolute right to remain silent; they can only refrain from answering incriminating questions. *Washington,* 431 U.S. at 183–84 n. 2, 97 S.Ct. at 1816–17 n. 2.

official investigations, where there are often impartial observers to guard against intimidation and trickery."

*Id.* at 579, 96 S.Ct. at 1777 (quoting *Miranda*, 384 U.S. at 461, 86 S.Ct. at 1620) (internal footnotes omitted). The plurality then concluded that "grand jury questioning[ ] take[s] place in a setting wholly different from custodial police interrogation." *Id.* at 580, 96 S.Ct. at 1778. The plurality, however, did not conclude that no Fifth Amendment warnings were required: "The fact that warnings were provided in this case to advise respondent of his Fifth Amendment privilege makes it unnecessary to consider whether any warning is required." *Id.* at 582 n. 7, 96 S.Ct. at 1779 n. 7.

Justices Brennan and Marshall, concurring in the judgment, disagreed with the plurality's distinctions of the grand jury context:

> I would hold that, in the absence of an intentional and intelligent waiver by the individual of his known right to be free from compulsory self-incrimination, the Government may not call before a grand jury one whom it has probable cause—as measured by an objective standard—to suspect of committing a crime, and by use of judicial compulsion compel him to testify with regard to that crime.... Such a waiver could readily be demonstrated by proof that the individual was warned prior to questioning that he is currently subject to possible criminal prosecution for the commission of a stated crime, that he has a constitutional right to refuse to answer any and all questions that may tend to incriminate him, and by record evidence that the individual understood the nature of his situation and privilege prior to giving testimony.

*Id.* at 598–600, 96 S.Ct. at 1787–88 (Brennan, J., concurring in the judgment) (footnotes omitted).[8]

Subsequent to *Mandujano*, the Court has further hinted to *Miranda*'s inapplicability to the grand jury setting. In *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79

L.Ed.2d 409 (1984), the Court held that a statement made by a probationer to his probation officer without any prior warnings was properly admitted in a subsequent criminal proceeding. The Court initially recognized that *Miranda* was inapplicable because "there was no formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* at 430, 104 S.Ct. at 1144 (quotation marks and citations omitted). Responding to the contention that *some* warnings were required because the probation officer could compel attendance and truthful answers, the Court stated:

> In our view, this factor subjected [the probationer] to less intimidating pressure than is imposed on grand jury witnesses, who are sworn to tell the truth and placed in a setting conducive to truthtelling. Although warnings in both contexts might serve to dissipate any possible coercion or unfairness resulting from a witness' misimpression that he must answer truthfully even questions with incriminating aspects, we have never held that they must be given to grand jury witnesses, and we decline to require them here since the totality of the circumstances is not such as to overbear a probationer's free will.

*Id.* at 431, 104 S.Ct. at 1144 (internal quotations and citations omitted). In response to the probationer's argument that he did not expect questions about prior criminal conduct and could not seek counsel prior to attending the meeting, the Court stated that "[the probationer's] situation was in this regard indistinguishable from that facing suspects who are questioned in noncustodial settings and grand jury witnesses who are unaware of the scope of an investigation or that they are considered potential defendants." *Id.* at 432, 104 S.Ct. at 1144.

The few circuits that have addressed this issue have likewise been hesitant to require as a matter of constitutional law *Miranda*-like warnings to suspects appearing before the grand jury. In *United States v. Gillespie*, 974 F.2d 796 (7th Cir.1992), the witness

---

**8.** Justices Stewart and Blackmun, concurring in the result, did not reach the issues raised by either the plurality or Justice Brennan's dissent. 425 U.S. at 609, 96 S.Ct. at 1792. Justice Ste-

vens did not participate in the decision. Thus, the plurality's reasoning represented the views of four justices, with two disagreeing and three not expressing any views.

received the written Advice of Rights form days before the grand jury hearing but did not receive oral warnings immediately before testifying and was not warned that he was a target. He contended that a suspect appearing before a grand jury has a constitutional right to warnings immediately prior to testifying. Relying on *Mandujano, Washington,* and *Murphy,* the Seventh Circuit concluded that the written Advice of Rights warning supplied days before the grand jury testimony satisfied any constitutional mandate that may exist. *Id.* at 803–05. *See also United States v. Goodwin,* 57 F.3d 815, 817 (9th Cir.1995) ("The key to [the defendant's] Fifth Amendment protection is that he not feel compelled to testify. The record reflects that [he] was more than adequately instructed that he was under no compulsion whatsoever to make any self-incriminating statements."); *Labbe v. Berman,* 621 F.2d 26, 29 (1st Cir.1980) (holding that *Miranda* warnings not required for suspect testifying at an inquest and that the fact that the commonwealth failed to administer any warnings to the suspect prior to his inquest did not render his inquest testimony inadmissible when the suspect's lawyer had told him what rights he had).

In light of the Supreme Court's opinions in *Mandujano, Washington,* and *Murphy,* and the opinions rendered by our sister circuits, we are satisfied that the warnings given to Myers adequately informed him of his Fifth Amendment privilege against self-incrimination. He was warned on the record, just prior to testifying, that he had a right to refuse to answer any question if it would incriminate him, a right to consult with an attorney, and that anything he said could be used against him. *Cf. Washington,* 431 U.S.

at 191, 97 S.Ct. at 1820 ("If anything, the proximity of the warnings to respondent's testimony and the solemnity of the grand jury setting seem likely to increase their effectiveness."). Moreover, because Myers was given these warnings, any compulsion to incriminate himself undoubtedly was substantially reduced. *Cf. id.* at 188, 97 S.Ct. at 1819 (stating that the warnings given eliminated "any possible compulsion to self-incrimination which might otherwise exist"). Additionally, there is no evidence that the government misled him in any way.[9] We therefore hold that, because Myers was adequately informed regarding his Fifth Amendment privilege against self-incrimination, the district court did not err in denying his motion to suppress his grand jury testimony.

## IV. OTHER ISSUES

### A. 404(b) Evidence

■ Myers contends that the district court erred by admitting testimony from Kelvin Smith, Eugene Cobbins, Gary King, and Luther Roberson regarding prior drug transactions involving him. The government, on the other hand, asserts that these prior acts established knowledge and intent, and were thus admissible under Federal Rule of Evidence 404(b).[10]

■ We review a district court's decision to admit evidence under Rule 404(b) under the following analysis:

[W]e first review for clear error the district court's factual determination that the "other ... acts" occurred. Second, we examine *de novo* the district court's legal determination that the evidence was admissible for a legitimate purpose. Finally,

9. In *United States v. Doss,* 563 F.2d 265, 275 (6th Cir.1977) (en banc), we stated: "When a person under our system of law has been indicted for a crime, the government has no more right to call him before a grand jury and question him about that crime than it has to call an unwilling defendant to the stand during trial of the case." Thus, because the government cannot call an indicted defendant to testify before the grand jury against his will about the crime for which he was indicted, there is a danger that the government might delay seeking an inevitable indictment in order to question a putative defendant before the grand jury. Although such a practice would raise a

host of constitutional concerns, we need not address these issues today because Myers has presented no evidence of improper conduct in this regard.

10. Rule 404(b) provides, in relevant part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."

we review for abuse of discretion the district court's determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect.[11]

*United States v. Merriweather*, 78 F.3d 1070, 1074 (6th Cir.1996) (citations omitted) (alteration in original).

In the present case, the court heard from four different witnesses, all of whom testified about engaging in drug transactions with the defendant. We conclude that the district court did not clearly err in determining that the other acts occurred.

The second Rule 404(b) step in this case is governed by our decision in *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir.1994), *cert. denied*, 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995), in which we held that "where there is thrust upon the government, either by virtue of the defense raised by the defendant or by virtue of the elements of the crime charged, the affirmative duty to prove that the underlying prohibited act was done with a specific criminal intent, other acts evidence may be introduced under Rule 404(b)." In this case, Myers contends that because his defense was that he did not even possess the drugs, "intent" was not in issue. We rejected a similar argument in *Johnson:*

> [R]egardless of Johnson's defense, since the government was obligated to prove not only that Johnson possessed the cocaine, but that he did so with the specific intent of distributing it, the government's evidence of other similar acts of possession with intent to distribute was admissible subject to the court's duty to weigh the probative value of the evidence against its prejudicial effect.

*Id.* at 1193. In light of *Johnson*, we conclude that the district court admitted the evidence for a proper purpose.

■■■ Our final inquiry under Rule 404(b) is to determine whether the district court abused its discretion by determining that the evidence of other acts was not substantially outweighed by the danger of unfair prejudice. Given the potential for confusion, misuse, and unfair prejudice from other acts evidence, it is preferable that the district court make an explicit finding regarding the Rule 403 balancing. *Id.* In this case, the district court considered the balancing and concluded that "[t]here is nothing about any of these sales, I take it, that [is] particularly egregious[;] they're just other sales." J.A. at 181. Another factor in the Rule 403 balancing is the availability of other means of proof, which would reduce the need for the potentially confusing evidence. *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996). The district court below also considered this factor and concluded that there was scant evidence of intent to distribute. J.A. at 181. Yet another pertinent factor is when the other acts occurred. *United States v. Ismail*, 756 F.2d 1253, 1260 (6th Cir.1985). The acts at issue in this case were all relatively close in time to the alleged crime so as to not prejudice Myers for something that happened in the distant past. Whether bad-act evidence unfairly prejudiced the defendant also is dependent in part on the nature of the limiting instructions given by the district court. *Merriweather*, 78 F.3d at 1077. In the present dispute, the district court gave a limiting instruction after each witness testified about Myers's drug dealings and at the close of the case. J.A. at 126, 188–89, 210–11, 222–23, 240–41, 248. The instructions given were clearly phrased and nearly

---

11. Our cases have not consistently described the third part of the Rule 404(b) analysis. In *United States v. Johnson*, 27 F.3d 1186 (6th Cir.1994), we stated that "we review for abuse of discretion the district court's determination that the 'other acts' evidence is *more probative than prejudicial.*" *Id.* at 1190 (emphasis added). In *United States v. Gessa*, 971 F.2d 1257 (6th Cir.1992) (en banc), we stated that "in ruling on the admission of 404(b) evidence, the district court must determine whether the 'other acts' evidence is *more unfairly prejudicial than probative*, which is gov-

erned by an abuse of discretion standard." *Id.* at 1262 (emphasis added). Because our caselaw makes clear that this third part of the Rule 404(b) analysis is derived from Rule 403, *see United States v. Acosta–Cazares*, 878 F.2d 945, 950 (6th Cir.), *cert. denied*, 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989); *Johnson*, 27 F.3d at 1192; *Merriweather*, 78 F.3d at 1077, the language in that rule (which is contained in the above-cited passage from *Merriweather*) is the language we employ in the present dispute.

**364**

identical each time.[12] They also correctly focused on "intent," the one relevant permissible use of the bad-act evidence. The instructions, however, incorrectly stated that the jury could use the bad-act evidence to ascertain whether Myers had the requisite "knowledge" to commit the crimes alleged. As we reiterated in *Johnson,* knowledge is at issue "when the defendant claims he was unaware that he was committing a criminal act[,]" but not when the defendant denies ever committing the criminal act at all. 27 F.3d at 1194. Here, appellant denied ever possessing the cocaine or possessing it with an intent to distribute. Even so, the instructions given adequately warned the jury of the potential misuses of the other-acts evidence. Analyzing all of the relevant Rule 403 factors, we are convinced that the district court did not abuse its discretion in determining that the probative value of the other-acts evidence was not substantially outweighed by its unfairly prejudicial effect.

### B. Relevant Conduct

 Defendant contends the district court erred in concluding that the other-acts evidence introduced at trial constituted "relevant conduct" under the United States Sentencing Guidelines ("U.S.S.G."). "Types and quantities of drugs not specified in the count of conviction [that qualify as relevant conduct] may be considered in determining the offense level." U.S.S.G. § 2D1.1, commentary, applic. note 12 (citing U.S.S.G. § 1B1.3(a)(2)). This court reviews the district court's factual findings that the alleged conduct occurred for clear error. *United States v. Hill,* 79 F.3d 1477, 1481 (6th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 158, 136 L.Ed.2d 102 (1996). If the findings were not clearly erroneous, we review de novo the determination that the conduct in question

constituted relevant conduct under U.S.S.G. § 1B1.3(a)(2). *Id.*

Prior drug dealings are relevant conduct if they constitute a "common scheme or plan" or are part of the "same course of conduct." U.S.S.G. § 1B1.3, commentary, applic. note 9. Two or more offenses constitute a "common scheme or plan" if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" *Id.* These offenses are part of the "same course of conduct" if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* Factors to take into account when determining the connectedness of events include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* Although the meanings of the terms "same course of conduct" and "common scheme or plan" are not identical, there is "considerable overlap between the terms," namely that they both focus on the similarity of the other conduct. *Hill,* 79 F.3d at 1482–83. Against this backdrop, we turn to the district court's finding of relevant conduct in this case.

The district court succinctly stated:

Application Note 9 [to U.S.S.G. § 1B1.3] is the relevant provision to look at here. The question is were these other drug transactions part of a common scheme or plan or part of the same course of conduct. [Defendant's drug transactions at issue here] all occurred within a period of less than 12 months. The powder was all a part of a joint enterprise that Mr. Myers and Mr. Kelvin Smith had going. And so was the

---

**12.** One of the instructions given by the court went as follows:

Okay. Ladies and gentlemen, as I instructed you before, you've heard evidence again here that the defendant engaged in criminal acts other than those specified in the indictment in this case. You may not consider this evidence to prove the proposition that merely because he may have engaged in those acts he did the acts that he is on trial here for.

You may consider the other criminal conduct only for the purpose of determining the

issues of whether the defendant had the requisite knowledge or intent to commit the crimes alleged in the indictment on February 9th, 1993. Remember that the defendant is on trial here only for the acts alleged in the indictment and not for any other acts and he should not be convicted unless you find that the government has proved beyond a reasonable doubt that the defendant knowingly committed the acts charged in the indictment in this case. J.A. at 188–89.

crack. Kelvin Smith testified that he and Myers had a joint operation. [He also testified] [t]hat they got the powder in Atlanta and in Houston, Texas, [that] they cooked it into crack, and [that] they pooled their money together to get that supply of cocaine. And I conclude that it is all relevant conduct.

J.A. at 260. In light of Kelvin Smith's testimony at trial, the district court's factual findings were not clearly erroneous. Additionally, the court did not err by concluding that appellant's drug transactions were sufficiently connected to each other. Not only were Smith and Myers "common accomplices" with a "common purpose," but their offenses, as found by the district court, were similar in nature, repeated on a regular basis, and all completed in a relatively short period of time. We thus conclude that the district court properly relied on these other offenses in computing Myers's sentence.

## V. CONCLUSION

Based on the foregoing reasons, we AFFIRM the judgment of the district court.

WELLFORD, Circuit Judge, concurring.

Although I concur in the result reached by the majority, I harbor serious doubts about whether the defendant was a target of any investigation at the time of his grand jury testimony, or even a putative defendant. Nevertheless, I am ultimately able to concur in the holding here simply because I find the majority's resolution of these issues to be absolutely unnecessary to the disposition of this case. After all, there is no dispute but that the warnings provided to the defendant were constitutionally adequate, regardless of his status.

In my opinion, the wiser course would be to avoid stamping our opinion on such unnecessary and potentially ground-breaking issues as they are not properly presented for decision by our court in this case. To that extent, I do not join in the majority opinion. As a result, I write separately only to indicate that part II should be viewed as dicta.